TEXACO INC. AND SUBSIDIARIES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 24855–89.      Filed December 15, 1993.

---

572

*Buford P. Berry, Emily A. Parker, Dennis J. Grindinger,* and *R. David Wheat,* for petitioners.

*Val J. Albright, Victoria J. Sherlock,* and *James E. Archie,* for respondent.

WHITAKER, *Judge:* A notice of deficiency for the years 1979, 1980, 1981, and 1982 was issued by respondent and was timely mailed to petitioners on July 31, 1989. Petitioners timely filed a petition herein contesting the deficiencies in tax determined by the Commissioner and claiming a refund of certain income tax overpayments plus interest as allowed by law. The issue for decision is the definition of "tar sands" for purposes of section 44D(c)(1)(A).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.[2] The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Texaco Inc. (Texaco) is a corporation organized under the laws of Delaware with a principal office in Houston, Texas.[3] Texaco timely filed consolidated corporate income tax returns on behalf of itself and its affiliated group for the taxable years ended December 31, 1979, 1980, 1981, and 1982. During and for the taxable years at issue herein, petitioners maintained their books and filed their consolidated income tax returns using the accrual method of accounting.

During the taxable years 1981 and 1982, petitioners were engaged in the business of acquiring, exploring, developing and operating oil and gas properties and in selling the production therefrom. During the taxable years 1981 and 1982, Texaco was the lessee with respect to certain oil and gas leases located in Santa Barbara County, California, near the city of Santa Maria, California. Petitioners did not claim that they were entitled to any Federal income tax credits pursuant to section 44D on any original (or amended) Federal income tax returns filed with respondent for the taxable

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue. Sec. 44D was enacted in 1980 and was redesignated as sec. 29 effective for tax years beginning after Dec. 31, 1983. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 471(c), 98 Stat. 494, 826.

[2] On Oct. 19, 1992, this Court ordered that the evidence presented at the first proceeding would be limited solely to the preliminary issue of what is the proper definition of tar sands for purposes of sec. 44D.

[3] Texaco is the parent corporation of an affiliated group of corporations which includes all of petitioners.

years 1981 and 1982 with respect to any crude oil produced from oil wells located on these leases. On August 5, 1988, petitioners made a timely informal claim for refund taking the position that petitioners were entitled to a tax credit pursuant to section 44D on the grounds that some crude oil produced from certain of the Santa Barbara oil and gas leases during the taxable years 1981 and 1982 qualified as "oil produced from * * * tar sands" under section 44D(c)(1)(A). After several revisions, the section 44D credit now claimed by petitioners totals $34,965 for the taxable year 1981 and $124,758 for the taxable year 1982.[4]

As of April 1980, no single definition of tar sands was universally recognized, but the term "tar sands" was generally understood within the oil and gas industry to mean a naturally occurring rock formation containing a hydrocarbon so viscous that it could not be economically produced through a well using only primary recovery methods. Primary recovery methods rely on natural energy (pressure) within the reservoir to move fluids from the rock into the well and are typically the first methods used to extract crude oil from a reservoir. Secondary recovery methods involve injecting gas and/or water into wells as a means of supplying additional energy to achieve higher recoveries and are typically applied in the second stage of production. Conventional recovery methods generally include both primary and secondary recovery methods.

In contrast to conventional recovery methods, enhanced oil recovery methods entail altering the characteristics of the fluids and/or rocks in a reservoir through the application of heat or the introduction of other substances. As of April 1980, steam flooding and cyclic steam injection were the thermal enhanced oil recovery methods most commonly used in the production of high viscosity crude oil.[5] Both steam flooding and cyclic steam injection were initially used in the United States in the early 1960s and involve the injection of

---

[4] The parties have stipulated that Texaco has satisfied all requirements for eligibility for the Federal income tax credit under sec. 44D if the crude oil production constitutes "oil produced from * * * tar sands" as that term is defined for purposes of sec. 44D(c)(1)(A).

[5] The viscosity of a liquid is a measure of its resistance to flow. A "thick" fluid such as molasses, honey, or tar has a high viscosity. A "thin" fluid such as water or gasoline has a low viscosity. Crude oil's viscosity is highly dependent on pressure, temperature, and the composition of the reservoir fluid.

steam into a well for purposes of heating and thinning crude oil.

In August 1980, 4 months after enactment of section 44D, the Department of Energy's Office of Oil and Natural Gas, Resource Applications held a workshop to establish a definition of tar sands that better distinguished between tar sands and heavy oil. By letter dated December 12, 1980, the Office of Oil and Natural Gas, Resource Application distributed the following definition of tar sands to be used for that office's Alternate Fuels Program:

Tar sand is any consolidated or unconsolidated rock (other than coal, oil shale, or gilsonite) that (1) contains a hydrocarbonaceous material with a gas-free viscosity, measured at reservoir temperature, greater than 10,000 centipoise, or (2) contains a hydrocarbonaceous material that is extracted from the mined or quarried rock.

The Department of Energy's definition of tar sands for purposes of the Alternate Fuels Program was consistent with the oil and gas industry's definition of tar sands as of April 1980.

## OPINION

The issue for decision is the definition of tar sands for purposes of section 44D(c)(1)(A). Section 44D was enacted by part III of title II of the Crude Oil Windfall Profit Tax Act of 1980 (COWPTA), Pub. L. 96-223, secs. 231, 238, 94 Stat. 229. Entitled the "Credit For Producing Fuel From A Nonconventional Source", section 44D was intended to encourage the development of alternative energy sources and to provide producers of alternative fuels with protection against significant decreases in the average wellhead price for uncontrolled domestic oil. S. Rept. 96-394, at 87 (1979), 1980-3 C.B. 131, 205; H. Conf. Rept. 96-817, at 139 (1980), 1980-3 C.B. 245, 299.

Pursuant to section 44D(a), a $3 credit was allowed for the domestic production of a barrel-of-oil equivalent of qualified fuel.[6] The credit was phased out as the average wellhead price per barrel of uncontrolled domestic oil rose from $23.50 to $29.50. Sec. 44D(b)(1). Pursuant to section 44D(c)(1), the term "qualified fuels" meant: (1) Oil produced from shale and tar sands; (2) gas produced from geopressured brine, Devo-

---

[6] A "barrel-of-oil equivalent" of qualified fuel generally meant the amount of qualified fuel having a Btu content of 5.8 million. Sec. 44D(d)(6)

nian shale, coal seams, or a tight formation; (3) gas produced from biomass; (4) liquid, gaseous, or solid synthetic fuels produced from coal, (5) qualifying processed wood fuels; and (6) steam produced from solid agricultural byproducts (not including timber byproducts). The term "tar sands" was not explicitly defined in either section 44D or its legislative history.

The principal objective in interpreting any statute is to determine what Congress meant by the use of the statutory language being construed. *United States v. American Trucking Associations,* 310 U.S. 534, 542 (1940); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 93-94 (1934); *Fehlhaber v. Commissioner,* 94 T.C. 863, 865 (1990), affd. 954 F.2d 653 (11th Cir. 1992); *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1980); *J.C. Penney Co. v. Commissioner,* 37 T.C. 1013, 1017 (1962), affd. 312 F.2d 65 (2d Cir. 1962). Where the statute is ambiguous, it is well established that we may look to its legislative history and to the reason for its enactment. *United States v. American Trucking Associations, supra* at 543-544; *Centel Communications Co. v. Commissioner,* 92 T.C. 612, 627-628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990); *U.S. Padding Corp. v. Commissioner, supra* at 184; *Estate of Baumgardner v. Commissioner,* 85 T.C. 445, 451 (1985); *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984); *J.C. Penney Co. v. Commissioner, supra* at 1017. If a term is used in the Code without definition and the legislative history fails to provide any insight or guidance as to the appropriate definition, the ordinary and common usage of the term is the definition which will be used in applying the provision of the Code. See *Commissioner v. Brown,* 380 U.S. 563, 570-571 (1965); *Crane v. Commissioner,* 331 U.S. 1 (1947); *Rome I, Ltd. v. Commissioner,* 96 T.C. 697, 704 (1991); *Union Pac. Corp. v. Commissioner,* 91 T.C. 32, 38-40 (1988); *First Savings & Loan Association v. Commissioner,* 40 T.C. 474, 482 (1963).

Petitioners contend that, in the absence of specific statutory or legislative guidance, the term "tar sands" must be defined in accordance with its ordinary and common meaning within the oil and gas industry. While no single definition of tar sands was universally recognized as of April 1980, the term "tar sands" was generally understood within the oil and

gas industry to mean a naturally occurring rock formation containing a hydrocarbon so viscous that it could not be economically produced through a well using only primary recovery methods.[7] Respondent contends that the statutory language and legislative history of section 44D indicate that the oil and gas industry's definition of tar sands is overinclusive and that Congress intended for tar sands to be defined in accordance with Federal Energy Administration (FEA) Ruling 1976-4, 41 Fed. Reg. 25886 (June 23, 1976).[8] FEA Ruling 1976-4 defined tar sands as follows:

The several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques. The hydrocarbon-bearing rocks are variously known as bitumen-rocks, oil impregnated rocks, oil sands, and rock asphalt.

For the reasons set forth below, we agree with respondent.

Section 44D was enacted to encourage the development and production of alternative energy sources. In explaining its reasons for enacting section 44D, the Senate Finance Committee stated as follows:

The committee believes that a tax credit for the production of energy from *alternative sources* will encourage the development of these resources by decreasing the cost of their production relative to the price of imported oil.

These *alternative energy sources* typically involve new technologies, and some subsidy is needed to encourage these industries to develop to the stage where they can be competitive with *conventional fuels.* * * *

[S. Rept. 96-394, at 87 (1979), 1980-3 C.B. 131, 205; emphasis added.]

The conventional fuel to which alternatives were being sought was, in the first instance, crude oil. The House and

---

[7] Petitioners concurrently assert that we should adopt the definition of tar sands promulgated in December 1980 by the Department of Energy's Office of Oil and Natural Gas, Resource Applications. The Department of Energy's definition was formulated 4 months after sec. 44D was enacted; we are not persuaded that Congress intended to utilize the specific centipoise figure (10,000) contained therein. Furthermore, the Department of Energy's definition is generally consistent with the oil and gas industry's understanding of the term "tar sands". Consequently, as we discuss below, both definitions are inconsistent with Congress' intent in enacting sec. 44D.

[8] FEA Ruling 1976-4, 41 Fed. Reg. 25886 (June 23, 1976), was promulgated by the Department of Energy to clarify the applicability of the Mandatory Petroleum Allocation and Price Regulations (MPAPR) to synthetic fuels processed from oil shale, tar sands, and other natural deposits that must be mined before the crude oil substitute could be extracted. The MPAPR provided for the allocation and pricing of "crude oil, residual fuel oil, and refined petroleum products". In FEA Ruling 1976-4, *supra,* the Department of Energy concluded that synthetic fuels did not fall within the purview of the MPAPR because, as of 1976, such crude oil substitutes were being produced for experimental rather than commercial purposes.

Senate conference committee emphasized the distinction between alternative energy sources and crude oil when stating that "This provision is intended to provide producers of alternative fuels with protection against significant decreases in the average wellhead price for the uncontrolled domestic oil, *with which alternative fuels frequently compete.*"[9] H. Conf. Rept. 96-817, at 139 (1980), 1980-3 C.B. 245, 299 (emphasis added). The distinction between alternative energy sources and crude oil was further emphasized by the staff of the Joint Committee on Taxation in its general explanation of section 44D:

> Prior law contained no income tax credit for the production and sale of fuel derived from energy sources other than oil and conventional sources of natural gas. * * * Congress believed that the use of fuels derived from energy sources other than oil and conventional natural gas should be encouraged by providing a tax incentive for their production and sale. Because these alternative fuels frequently compete with oil and gas, Congress believed that production incentives should be linked to the uncontrolled price of domestic oil and should phase out as that price rises to the level where efficiently produced alternative fuels should be able to compete effectively with oil. * * * [Staff of Joint Comm. on Taxation, General Explanation of the Crude Oil Windfall Profit Tax Act of 1980, at 80 (J. Comm. Print 1981).]

Thus, section 44D was not intended to subsidize the production of crude oil but, to the contrary, was intended to encourage the development of crude oil substitutes. Consequently, alternative energy sources include crude oil substitutes such as oil produced from tar sands but do not include crude oil.

Petitioners' proposed definition of tar sands describes a highly viscous hydrocarbon that "could not be economically produced through a well using only primary recovery methods." Alternatively, respondent's proposed definition of tar sands describes a highly viscous hydrocarbon that is "not recoverable in its natural state by conventional oil well production methods including currently used enhanced recov-

---

[9] In the Conference Comparison on H.R. 3919 prepared by the staff of the Joint Committee on Taxation for the use of the House and Senate conferees, tar sands were described for purposes of the Alternative Energy Production Tax Credit as being subject to a 14-percent allowance for depletion. Pursuant to sec. 613(b)(7), the 14-percent depletion rate applies to "all other minerals"; pursuant to sec. 613(b)(7)(C), however, the term "all other minerals" does not include oil and gas wells. Additionally, the Conference Comparison described tar sands as "unregulated" for price control purposes, while crude oil was subject to price controls under the Emergency Petroleum Allocation Act of 1973, Pub. L. 93-159, 87 Stat. 627. Thus, while the Conference Comparison is not part of COWPTA's legislative history, it is consistent with Congress' treatment of tar sands and crude oil as different substances.

ery techniques." Primary recovery methods rely on natural energy (pressure) within the reservoir to move fluids from the rock into the well. Secondary recovery methods involve injecting gas and/or water into wells as a means of supplying additional reservoir energy. Conventional recovery methods generally include both primary and secondary recovery methods. In contrast to conventional recovery methods, enhanced oil recovery methods entail altering the characteristics of the fluids and/or rocks in a reservoir through the application of heat or the introduction of other substances. Thus, pursuant to petitioners' proposed definition, high viscosity crude oil that could not be economically produced using only primary recovery methods—but that could be economically produced using either secondary or enhanced oil recovery methods—would be characterized as oil produced from tar sands; conversely, pursuant to respondent's proposed definition, high viscosity crude oil that could be produced using either conventional or enhanced oil recovery methods would not be characterized as oil produced from tar sands.

As the legislative history of section 44D makes clear, Congress intended the credit to apply to alternative energy sources. The principal conventional energy source to which an alternative was sought was crude oil. Thus, section 44D was not enacted to encourage the production of crude oil; rather, it was enacted to encourage the development of crude oil substitutes. Based upon the record before us, we conclude that, as of April 1980, high viscosity crude oil that could be economically produced using either conventional or enhanced oil recovery methods did not constitute an alternative energy source within the meaning of section 44D and that Congress did not intend for such high viscosity crude oil to be eligible for the alternative fuels credit. Petitioners' proposed definition would characterize as tar sands certain high viscosity crude oil that could be economically produced using either secondary or enhanced oil recovery methods in use as of April 1980. Thus, petitioners' proposed definition would make high viscosity crude oil eligible for the section 44D credit notwithstanding Congress' intention to encourage the development and production of crude oil substitutes. Respondent's proposed definition, however, effectuates Congress' intent by limiting the section 44D credit to crude oil substitutes that

could not be produced using either conventional or enhanced oil recovery methods in use as of April 1980.

Additional insight into Congress' understanding of the term "tar sands" can be found in the legislative history to title I of COWPTA. Title I imposed an excise tax on the windfall profit from the removal of taxable crude oil. Sec. 4986(a). For purposes of title I, crude oil included heavy oil and incremental tertiary oil. Sec. 4991(e)(1)(C). The term "heavy oil" meant all crude oil produced from a property if such crude oil had a weighted average gravity of 16.0 degrees API or less (corrected to 60 degrees Fahrenheit). Sec. 4991(e)(3). Pursuant to section 4993(a), "incremental tertiary oil" was the excess of the amount of crude oil removed from a property during the period for which a qualified tertiary recovery project was in effect over the base level of crude oil removed from the property.[10] In describing crude oil in the legislative history to title I, Congress explicitly stated that crude oil included only natural crude petroleum and did not include synthetic petroleum such as oil production from tar sands. S. Rept. 96-394, at 56 (1979), 1980-3 C.B. 131, 174; H. Conf. Rept. 96-817, at 114 (1980), 1980-3 C.B. 245, 274. From this it is clear that Congress understood oil produced from tar sands to be a crude oil substitute and not simply a type of high viscosity crude oil.

For purposes of title I, crude oil included heavy oil and incremental tertiary oil but did not include synthetic petroleum such as oil produced from tar sands. Heavy oil and incremental tertiary oil included high viscosity crude oil produced using a variety of enhanced oil recovery methods, including steam drive injection and cyclic steam injection. For purposes of title II, petitioners propose to define tar

---

[10] Pursuant to sec. 4993(c), a "qualified tertiary recovery project" included any project for enhancing the recovery of crude oil which involved the application of one or more tertiary recovery methods. A "tertiary recovery method" included any of the following methods described in subparagraphs (1) through (9) of sec. 212.78(c) of the Mandatory Petroleum Price Regulations as such regulations existed on June 1, 1979:

1. Miscible fluid displacement
2. Steam drive injection
3. Microemulsion or micellar emulsion flooding
4. In situ combustion
5. Polymer augmented waterflooding
6. Cyclic steam injection
7. Alkaline (or "caustic") flooding
8. Carbon dioxide augmented waterflooding
9. Immiscible carbon dioxide displacement.

sands as including certain high viscosity crude oil that could be economically produced using secondary and enhanced oil recovery methods in use as of April 1980; i.e., heavy oil and incremental tertiary oil. Therefore, the adoption of petitioner's proposed definition of tar sands would result in conflicting definitions for purposes of title I and title II.

High viscosity crude oil produced using secondary and enhanced oil recovery methods would be characterized as crude oil (which does not include oil from tar sands) for purposes of title I, while the same high viscosity crude oil would be characterized as oil produced from tar sands for purposes of title II. While the reference to tar sands in defining crude oil for purposes of title I is not determinative in defining tar sands for purposes of title II, we do not think that Congress would have used the term "tar sands" in fundamentally different ways within the same legislative enactment without clearly expressing an intent to do so. See *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87 (1934), wherein the Supreme Court stated that "'there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning'" (quoting *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433 (1932)); see also *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. ___, 113 S. Ct. 2006 (1993); *Commissioner v. Estate of Ridgway,* 291 F.2d 257, 259 (3d Cir. 1961) affg. 33 T.C. 1000 (1960). Furthermore, we find Congress' description of crude oil as including heavy oil and incremental tertiary oil and as excluding synthetic petroleum such as oil produced from tar sands to be completely consistent with section 44D's emphasis upon the development and production of crude oil substitutes—specifically including oil produced from tar sands. As of April 1980, Congress clearly considered crude oil (including heavy oil and incremental tertiary oil) and oil produced from tar sands to be mutually exclusive substances. Therefore, crude oil did not include synthetic petroleum such as oil produced from tar sands and, conversely, alternative energy sources (including crude oil substitutes such as oil produced from tar sands) did not include crude oil. Finally, in contrast to petitioners' proposed definition of tar sands, respondent's proposed definition is in accord with Congress' statement that crude oil does not include oil produced from tar sands; i.e., high viscosity crude oil produced using either

conventional or enhanced oil recovery methods in use as of April 1980 would constitute crude oil rather than oil produced from tar sands.

Congress explicitly stated that the section 44D credit was intended to apply to alternative energy sources. We conclude that high viscosity crude oil that could be economically produced using either conventional or enhanced oil recovery methods in use as of April 1980 did not constitute an alternative energy source and that Congress did not intend for such crude oil to be treated as oil produced from tar sands. Therefore, we hold that, as of April 1980, "tar sands", for purposes of the alternative fuel production credit under section 44D, consisted of the following:

The several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques. The hydrocarbon-bearing rocks are variously known as bitumen-rocks, oil impregnated rocks, oil sands, and rock asphalt.

*An appropriate order will be issued.*