**SHELL PETROLEUM, INC. and Subsidiary Corporations, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CIV. A. 93-508-JJF.**

United States District Court, D. Delaware.

Oct. 16, 1997.

William O. LaMotte, III, Elaine C. Reilly, Morris, Nichols, Arsht, & Tunnell, Wilmington, DE. Of Counsel: B. John Williams, Jr., Mary E. Baluss, Morgan, Lewis & Bockius, LLP, Washington, DC; Charles R. Herpich, Jr., Sara D. Trapani, Shell Petroleum, Inc., Houston, TX; Charles W. Hall, Fulbright & Jaworski, LLP, Houston, TX, for Plaintiff.

Gregory M. Sleet, U.S. Atty., Wilmington, DE. Dennis M. Donohue, Special Litigation Counsel, Jonathan Jackel, Trial Attorney, Tax Division, U.S. Dept. of Justice, Washington, DC. Victoria J. Ely, Special Assistant to the Tax Division, District Counsel, I.R.S., Houston, TX, for Defendant.

## *MEMORANDUM OPINION*

FARNAN, Chief Judge.

### I. *BACKGROUND*

This is an action brought by Plaintiff, Shell Petroleum Inc. ("Shell"), pursuant to 26 U.S.C. § 7422 for the refund of claimed overpaid federal income taxes and interest due thereon under 26 U.S.C. § 6611. Shell is incorporated under the laws of the State of Delaware and maintains a principal office in Delaware at 1105 Market Street, Wilmington, Delaware, 19899. (D.I. 296 at ¶ 2(a)). Shell is the common parent of an affiliated group of corporations (the "Shell Affiliated Group"). The Shell Affiliated Group files consolidated federal income tax returns, and their taxable year is the calendar year. (D.I. 342 at 1, ¶ 4).

On May 15, 1991, Shell timely filed claims for a refund of the Shell Affiliated Group's 1983 and 1984 consolidated federal income taxes with the Internal Revenue Service ("the IRS"). (D.I. 296 at ¶ 2(c)). On its 1983 and 1984 Amended Returns, Shell claimed credits against 1983 and 1984 federal income taxes for oil recovered from its Midway Sunset Oil Field in Kern County, California, pursuant to 26 U.S.C. § 29. (D.I. 296 at ¶ 2(c)); (D.I. 296 at 5, ¶ 9). Shell claimed tax credits of $1,690,902 for 1983 and $3,660,248 for 1984. (D.I. 296 at 24). The IRS denied Shell's refund claims, and thereafter Shell timely filed a complaint in this Court on October 29, 1993, asserting counts consistent with the refund claims. (D.I. 296 at ¶ 2(c)).

Jurisdiction is conferred upon the Court by 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1). A bench trial was held on this matter, and this Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

### II. *THE BASIS OF THE LAWSUIT*

Pursuant to Title 26, Section 29 of the Internal Revenue Code, oil companies are eligible for an income tax credit of $3.00 for each barrel of "oil produced from ... tar sands." 26 U.S.C. § 29(c)(1)(A). Section 29, however, does not define the term "tar sands." The Government argues that the appropriate definition of "tar sands" is found in Federal Energy Administration Ruling 1976–4 ("the FEA Ruling"), which defines tar sands as:

> The several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques.

41 Fed.Reg. 25886 (1976). Shell contends that the proper definition for "tar sands" as used in Section 29 results from a consensus developed in the petroleum industry that oil produced from tar sand is oil with a viscosity [1] greater than 10,000 centipoise, measured

1. Viscosity is the measure of a fluid's resistance to flow. (D.I. 296 at 4). In an oil reservoir, viscosity is the measure of the oil's resistance to movement through the reservoir rock to the well-

gas-free, at original reservoir temperature ("the Viscosity Standard"). (D.I. 342 at 23–24). The parties agree that if the Court determines that the FEA Ruling definition of "tar sands" is to be applied when interpreting Section 29, judgment should be entered for the Government. (D.I. 255 at 16, n. 44). On the other hand, if the Court determines that the FEA Ruling definition does not apply to Section 29, the Court must then determine whether Shell's proposed 10,000 centipoise standard is a universally accepted industry definition of "tar sands." If the Court accepts the industry's definition, it must also decide when that standard became the accepted industry definition of "tar sands" and whether Shell has in fact proven that the oil samples taken from its fields in the Potter Sands have a viscosity greater than 10,000 centipoise.

## III. *HISTORICAL BACKGROUND*

In the early 1970's, the United States experienced a series of crises related to the country's oil supplies. These crises resulted from instability in international oil markets which in turn caused severe fluctuations in the price of imported oil. In an effort to alleviate these crises, the federal government enacted a series of extensive regulations.

The first energy crisis occurred in October, 1973, in the wake of the Arab–Israeli War, when the Organization of Petroleum Exporting Countries ("OPEC") imposed an oil embargo on western countries, including the United States. Gary D. Allison, *Energy Sectionalism: Economic Origins and Legal Responses,* 38 Sw. L.J. 703, 705 (1984). The embargo, followed by a cartel pricing strategy, caused world oil prices to quadruple in less than a year and plunged numerous western economies into a cycle of inflation and recession. *Id.*

### A. The Emergency Petroleum Allocation Act of 1973

On November 27, 1973, in response to the increased price of world oil, the United States Congress enacted the Emergency Petroleum Allocation Act ("EPAA"). *See* 15 U.S.C. §§ 751–760. The EPAA mandated that the President promulgate regulations providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, at specified prices and amounts. 15 U.S.C. § 753(a).

While the price control system became increasingly complex, its two main components were "price ceilings" and "entitlement" payments. First, the EPAA set various price ceilings for two classifications of domestically produced oil. *Proposed Windfall Profit Tax and Creation of Energy Trust Fund: Hearings Before the Committee on Ways and Means,* No. 96–34, at 15–16 (1979) (hereinafter "*Hearing*"). Second, to prevent disparity in prices for crude oil from upsetting the competitive balance among regions of the country and within the oil refining industry, the EPAA used an "entitlement" system to equalize the costs of crude oil to all refiners. *Id.* at 16. Under this system, refineries were required to make "entitlement" payments to each other to ensure that each refinery paid the same average price for a barrel of oil, regardless of whether the oil was imported or domestically produced. *Id.* As a result, refiners who purchased more expensive imported oil were compensated by refiners who purchased domestically produced oil, which was less expensive due to the aforementioned price ceilings. *Id.* In effect, refiners who purchased less expensive domestic oil were required to subsidize competitors who purchased more expensive imported oil.

While the purpose of the EPAA was to "deal with shortages of crude oil, residual fuel oil, and refined petroleum products" in such a way as to "minimize the adverse impacts of such shortages ... on the American people and the domestic economy," it had the opposite effect. *Id.;* 15 U.S.C. § 751(b). Because the price of domestic oil was controlled by the EPAA's price ceilings, the incentive to produce domestic oil was removed. *Hearing, supra,* at 16. Consequently, there was incentive for oil companies to import more expensive foreign oil. There-

bore. (D.I. 296 at 4). Given uniform pressure and rock properties, a more viscous oil will move through the reservoir more slowly than a less viscous oil. Viscosity is measured in "poise." (D.I. 296 at 4). Oil field viscosity is usually stated in centipoise ("cp"). (D.I. 296 at 4).

fore, as a result of the price controls and entitlement payments, the EPAA regulations encouraged oil consumption and importation and discouraged domestic oil production and the development of new energy sources.

### B. The FEA Definition of Tar Sands

In 1976, the Federal Energy Administration ("FEA") received several inquiries with respect to whether the so-called "synthetic fuels," fuels processed from oil shale, tar sands, coal, and other natural deposits that must be mined before the crude oil substitute can be extracted, were subject to the price controls of the EPAA. FEA Ruling 1976–4, 41 Fed.Reg. 25886 (1976). In response to these inquiries, the FEA issued Ruling 1976–4, which announced the definition of tar sands that the Government relies upon in the instant action. FEA Ruling 1976–4 defines tar sands as

> the several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques.

*Id.* at 25886.

In rendering its decision, the FEA determined that Congress intended the EPAA price controls to apply only to fuel resources that were threatened to be in short supply. *Id.* The FEA reasoned that Congress could not have intended to extend price controls to crude oil substitutes because crude oil substitutes were not being commercially produced when the EPAA was enacted. *Id.*

### C. Titles I and II of the Crude Oil Windfall Profit Tax Act of 1980

As a result of the Iranian Revolution which halted Iranian oil exports for three months, the United States faced its second energy crisis in 1979. Allison, *supra,* at 706. Due to the reduction in Iranian oil production, world oil prices doubled, creating an economic shock even more severe than that experienced in 1973. *Id.* This price increase for imported oil further enlarged the gap between the cost of world oil and the cost of price-controlled domestic oil.

In April 1979, the Carter Administration announced its intention to exercise its discretionary authority and phase out the domestic oil price controls between June 1, 1979 and September 30, 1981, the date the EPAA regulations were to expire. H.R.Rep. No. 96–304, at 4 (1979), *reprinted in* 1980 U.S.C.C.A.N. 587, 591. In May 1979, shortly before the start of the phased decontrol, lower tier domestic oil was controlled at an average price of $5.91 per barrel and upper tier domestic oil at an average price of $13.02 per barrel. *Id.* At the same time, the average price of uncontrolled world oil, to which the price of both lower tier and upper tier oil was expected to rise as the price controls were phased out, was approaching $30 per barrel. *Id.* Therefore, the decontrol of domestic oil prices was expected to cause a significant increase in revenues received by oil producers and royalty owners. *Id.* at 7.

In response to the enormous increase in revenues that oil companies were expected to experience due to the price control phaseout, Congress enacted the Crude Oil Windfall Profit Tax Act ("COWPTA") of 1980. Under Title I of COWPTA, a Windfall Profit Tax ("WPT") was imposed on each barrel of domestically produced crude oil to supplement the decontrol of oil prices. 26 U.S.C. §§ 4986–4997 (repealed 1988). The purpose of the tax was to prevent oil companies and royalty owners from experiencing exceptional profits due to the phase out of price controls, while passing the increased oil cost to the consumer. S.Rep. No. 96–394, at 2 (1979), *reprinted in* 1980 U.S.C.C.A.N. 410, 414. The tax rate imposed ranged from 30 to 70 percent of the windfall profit realized as a result of price decontrol, depending on the type of oil produced. 26 U.S.C. § 4987(b)(1)-(3) (repealed 1988). To encourage greater production of domestic oil, the tax exempted newly discovered oil, incremental production oil, and the first 1,000 barrels per day of stripper oil produced by independent producers. S.Rep. No. 96–394, at 1–2, 1980 U.S.C.C.A.N. at 413–14.

In its report discussing the Windfall Profit Tax, the United States Senate Finance Committee discussed the creation of business energy incentives. *Id.* at 3. The report stated

that the Finance Committee sought to provide "significant tax incentives to encourage businesses to conserve energy and produce alternative sources of energy." *Id.*

To further this end, the report contained a provision specifically aimed at providing an alternative fuel production tax credit. *Id.* at 3. The $3.00 per barrel tax credit for "producing fuel from a nonconventional source" was codified in 26 U.S.C. § 29, Title II of COWPTA, and extended to "oil produced from ... tar sands." 26 U.S.C. § 29(c)(1)(A).[2] Title II of COWPTA provided for the use of its revenue to encourage energy conservation, promote production from alternate energy sources and ease the burden of higher energy prices on lower-income households. S.Rep. No. 96–394 at 27, 1980 U.S.C.C.A.N. at 437.

## IV. *THE PARTIES' CONTENTIONS*

### A. Shell's Position

Shell argues that the definition of the term "tar sands" as used in Section 29 is a question of fact. (D.I. 255 at 10). In support of its position, Shell argues that neither Section 29 nor the legislative history explicitly define "tar sands" and that the term does not have clear meaning to a layperson, but does have a particular meaning within the petroleum industry. (D.I. 255 at 10–11). Shell asserts that the Court cannot be expected to have specialized petroleum industry knowledge, and therefore, expert testimony is admissible to assist the Court in determining an accurate definition. (D.I. 255 at 11).

At trial, Shell offered expert testimony that in 1983 and 1984 the consensus industry definition of tar sands was crude oil with a viscosity greater than 10,000 centipoise measured gas-free at original reservoir temperature. (D.I. 255 at 8); (D.I. 307, Aziz at B–88). Shell argues that this industry definition is practical, administratively feasible and the product of a consensus building among the petroleum industry's best technical experts that began years before Section 29 was enacted. (D.I. 255 at 8).

Shell further argues that the industry definition of tar sands is in consonance with the Congressional intent of the Section 29 tax credit. (D.I. 342 at 63). Shell asserts that the legislative history of Section 29 establishes that the purpose of the tax credit was to increase domestic oil production by encouraging the development of "alternative energy sources" and did not require investment in new technology. (D.I. 342 at 63). On this point, Shell argues that prior to the enactment of the tax credit, high viscosity tar sand oil was not commercially produced because its production costs were higher than those of conventional crude oil. (D.I. 342 at 64). Shell argues that by virtue of the tax credit, tar sands became competitive with conventional oil and enabled oil companies to commercially produce tar sand oil. (D.I. 342 at 64). Therefore, Shell contends that high viscosity tar sand oil constitutes an "alternative energy source" because it was not commercially produced prior to the enactment of Section 29. (D.I. 342 at 65). Lastly, Shell argues that extending the Section 29 tax credit to high viscosity tar sand oil fulfills Congressional intent to increase domestic oil production and reduce the nations dependence on imported oil. (D.I. 342 at 63).

### B. The Government's Position

The Government argues that the definition of "tar sands" is a legal question and exclusively a judicial determination. (D.I. 334 at 50). Because the definition is a legal question, the Government argues that the Court should not consider the expert testimony of petroleum engineers, but should limit its consideration to the plain meaning of the language of the statute and its legislative history. (D.I. 246 at 16).

The Government asserts that the statutory language and legislative history of Title I of COWPTA, which imposes the $3.00 per barrel excise tax on domestically produced crude oil, provides sufficient evidence for the Court to conclude that Congress intended the FEA Ruling to define tar sands for the purposes of the Section 29 tax credit. (D.I. 334 at 52). According to the Government, Title I of

2. Section 29 was originally enacted in 1980 as Section 44D, and redesignated as Section 29 in the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 826.

COWPTA subjected all nonexempt domestic crude oil to the WPT, and defined "crude oil" as having "the meaning given to such term by the June 1979 energy regulations." (D.I. 246 at 23). Therefore, the Government asserts that COWPTA incorporated the 1979 energy regulation promulgated by the Department of Energy ("DOE") and its predecessor the FEA. (D.I. 246 at 23). Additionally, both the House and Senate conference reports explicitly state that "it is anticipated that the Secretary will give due consideration to the various administrative rulings and judicial decisions which have interpreted or which construe those regulations." (D.I. 246 at 23 (citing H.R.Rep. No. 96-304, at 36 (1979); S.Rep. No. 96-394, at 56 (1979)). The Government interprets these statements as establishing congressional intent to draw the definitions of terms contained in COWPTA from FEA regulations and rulings and that at the time Congress passed COWPTA the only definition of tar sands for purposes of the June 1979 energy regulations was the FEA Ruling. (D.I. 246 at 23).

The Government argues that the EPAA, the price control phase out, and Titles I and II of COWPTA constitute an integrated statutory scheme dealing with the country's oil production. (D.I. 334 at 71). More specifically, the Government asserts that the WPT, Title I of COWPTA, was enacted to address the windfall profits created by the phase out of the price controls created under the EPAA. (D.I. 334 at 71). Further, the Government argues that the WPT mandated that the revenues from the tax be used to fund various energy programs, including the income tax credits contained in Title I of COWPTA, and that Section 29 is part of Title II of COWPTA. (D.I. 334 at 71). Consequently, the Government contends that because Title I and Title II are part of an integrated statutory scheme aimed at regulating aspects of the oil industry, the definition of a term used in Title I must also apply to the same term used in Title II. (D.I. 334 at 72). Pursuant to this reasoning, the Government argues that the definition of "tar sands" articulated in FEA Ruling 1976-4 applies to the term "tar sands" as used in Section 29.

The Government also asserts that the legislative history of Section 29 establishes that the tax credit was intended for oil companies who developed new technologies in an effort to discover alternative sources of energy. (D.I. 334 at 54). According to the Government, the tar sands definition contained in the FEA Ruling is consistent with Congressional intent to promote new oil production technology because it excludes from the Section 29 tax credit oil produced by conventional oil well production methods, including currently used enhanced recovery techniques (production methods that were already in use within the petroleum industry when the credit was enacted). (D.I. 334 at 58-60).

## V. *STANDARD OF REVIEW*

In a tax refund suit, the taxpayer bears the burden of proving that it is entitled to a refund. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Sullivan v. United States,* 618 F.2d 1001, 1008-09 (3d Cir.1980); *Tunnell v. United States,* 512 F.2d 1192, 1194 (3d Cir.), *cert. denied* 423 U.S. 893, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975). For the reasons discussed below, the Court finds that Shell has not met its burden in this case.

## VI. *DISCUSSION*

The Court concludes that the definition of "tar sands" under Section 29 is a question of law, and the definition contained in FEA Ruling 1976-4 and advanced by the Government in this case is applicable for the purposes of COWPTA. The Court bases its decision on three factors: 1) statutory interpretation and legislative intent; 2) the unworkability of the definition advanced by Shell; and 3) the reasoning of the Tax Court in *Texaco Inc. v. Commissioner of Internal Revenue,* 101 T.C. 571, 1993 WL 516193 (1993).

### A. Statutory Interpretation and Legislative Intent

Statutory interpretation is a question of law reserved for the Court. *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). The Court's main objective in interpreting

any statute is to determine what Congress meant by the use of the statutory language being construed. *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345, *reh'g denied* 311 U.S. 724, 61 S.Ct. 53, 85 L.Ed. 472 (1940); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 93–94, 55 S.Ct. 50, 79 L.Ed. 211 (1934); *Sperling v. Hoffmann–La Roche,* 24 F.3d 463, 470 (3d Cir.1994). Where statutory language is ambiguous, the Court may look to legislative history and to the reasons for the statute's enactment. *American Trucking,* 310 U.S. at 543–544; *Atlantic Mut. Ins. Co. v. Commissioner of Internal Revenue,* 111 F.3d 1056, 1057, 1062 (3d Cir.1997). If the legislative history indicates the meaning of a statutory term, courts will reject the application of expert testimony to define the term. *Principal Mut. Life Ins. Co. v. United States,* 26 Cl.Ct. 616, 624–25 (1992), *modified on other grounds,* 29 Fed. Cl. 157 (1993), *aff'd,* 50 F.3d 1021, 1995 WL 114783 (Fed. Cir.1995); *American Nat'l Insurance Co. v. United States,* 231 Ct.Cl. 604, 690 F.2d 878, 888 (Cl.Ct.1982).

Preliminarily, it is noted that the title of an act may shed light on the intended meaning of a statute. *Maguire v. Commissioner of Internal Revenue,* 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941). Section 29 is entitled "Credit for Producing Fuel From a Nonconventional Source." This title provides an initial indication of Congress' intent to promote the use of new or atypical sources of fuel.

Exploration of the legislative history of COWPTA reveals the congressional intent to encourage the development of alternative sources of energy. In its 1979 report to Congress, the Senate Finance Committee stated its belief that "a tax credit for the production of energy from *alternative sources* will encourage the development of these resources ... These alternative energy sources typically involve *new technologies,* and some subsidy is needed to encourage these industries to develop to the stage where they can be competitive with conventional fuels." S.Rep. No. 96–394 at 87 (emphasis added), 1980 U.S.C.C.A.N. at 496. From these comments, made in the context of a national fuel crisis, it is evident that through COWPTA, Congress contemplated providing an incentive for the development of new technologies that would facilitate the production of alternative fuel sources. This view is reinforced by the House and Senate conference committee report, which states that "[t]his provision is intended to provide producers of alternative fuels with protection against significant decreases in the average wellhead price for the uncontrolled domestic oil, with which alternative fuels frequently compete." H. Conf. Rep. No. 817, at 139, *reprinted in* 1980 U.S.C.C.A.N. 691.

This Committee Report statement also indicates Congress' intent to limit the credit given in Section 29 to crude oil substitutes, rather than domestic crude oil. At the time the statute was enacted, domestic crude oil was being produced in large amounts, by conventional recovery methods. *See generally,* S.Rep. No. 96–394 at 2, 1980 U.S.C.C.A.N. at 414; H.R.Rep. No. 96–304 at 4–7, 1980 U.S.C.C.A.N. at 591–94. For this reason, domestic crude oil would not logically be categorized as an alternative energy source. Congress believed that domestic crude oil production would be sufficiently stimulated by the presidential order lifting the price controls. H. Rep. No. 96–304 at 7, 1980 U.S.C.C.A.N. at 594. Therefore, Congress had no need to subsidize the production of domestic crude oil. Rather, it endeavored to credit the production of alternative fuels or so-called crude oil substitutes.

The definition of "tar sands" contained in the FEA Ruling is completely congruous with Congress' intent to both encourage the development of new technologies and limit the Section 29 credit to crude oil substitutes that could not be obtained using conventional methods. As previously discussed, the Ruling was issued in response to inquiries regarding the scope of price controls and their application to synthetic fuels or crude oil substitutes. FEA Ruling 1976–4, 41 Fed. Reg. 25886 (1976). The Ruling holds that under the EPAA, the price controls only apply to those fuels in short supply. *Id.* Because crude oil substitutes, such as tar sand oil, were not being produced commercially either in 1973, when the EPAA was

enacted, or in 1976, when the Ruling was issued, the Ruling concludes that Congress could not have intended the price controls to extend to those crude oil substitutes. *Id.*

Thus, the FEA Ruling excludes from the definition of tar sands any crude oil that was being commercially produced at the time. The Ruling characterizes tar sands as

> the several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques.

*Id.* This language clearly excludes oil recovered from conventional sources and, in turn, includes oil obtained from alternative sources. At the same time, it reflects the effort by Congress to promote the development of new technologies and new sources of oil recovery. Moreover, applying the FEA definition to Section 29 and thereby limiting the credit to oil not recoverable by conventional methods results in the exclusion of domestic crude oil from the credit. This, too, is consistent with Congress' intent in enacting Section 29 to provide a credit for the production of crude oil substitutes, rather than domestic crude oil.

In addition to its compliance with congressional intent, further support for the application of FEA Ruling 1976-4 to the Section 29 (Title II) definition of tar sands is found in Title I. In creating a tax on crude oil, Title I states that crude oil is to be defined according to "the June 1979 energy [(EPAA)] regulations." 26 U.S.C. § 4996(b) (repealed 1988). Numerous other statutory terms in Title I also refer to the June 1979 energy regulations. *See, e.g.,* 26 U.S.C. §§ 4991(d)(1)(a), (e)(2), 4993(b)(1), (b)(2), (c)(1)(A). In addition, the Report of the Senate Committee on Finance states that "it is anticipated that the Secretary will give due consideration to the various administrative rulings and judicial decisions which have interpreted or which construe [the energy] regulations." S.Rep. No. 96-394 at 57, 1980 U.S.C.C.A.N. at 466-67. All of these factors indicate Congress' intent that the regulations and rulings promulgated by the FEA under the EPAA be applied to COWPTA.

These references in Title I and in the legislative history to FEA regulations and rulings take on special significance when viewed in the context of the Act as a whole. Title I, which creates the tax on crude oil, and Title II, which grants a credit for oil derived from alternative sources, are both pieces of a comprehensive, integrated statutory scheme directed toward addressing the energy crisis of the late 1970's. The substantial link between the two statutes is evidenced by Congress' indication that the revenue derived from the Title I tax would serve to fund energy programs enacted under COWPTA. H.R.Rep. No. 96-304 at 4, 1980 U.S.C.C.A.N. at 591; S.Rep. No. 96-394 at 8, 1980 U.S.C.C.A.N. at 419. In light of this unified statutory scheme, it is both reasonable and appropriate to extend to Title II a definition contained in an administrative ruling directly applicable to Title I.

Shell argues that it is incorrect to apply Ruling 1976-4 to define "tar sands" for the purpose of Section 29. First, Shell argues that the Government's position incorrectly assumes that the EPAA and Section 29 tax credit are *in pari materia.* (D.I. 342 at 65). Shell argues that broad references to the same subject matter are insufficient to support *in pari materia* reading of statutes. (D.I. 342 at 67) On this point, Shell contends that while EPAA and Section 29 both deal with the subject of oil production generally, their particular purposes are completely opposite. Shell asserts that the FEA Ruling defines tar sands pursuant to the EPAA, not COWPTA. (D.I. 342 at 66). Shell argues that the EPAA created price ceilings on domestic oil in order to decrease production, whereas COWPTA was part of an effort to lift the price controls in order to increase domestic oil production. (D.I. 342 at 66). Therefore, because the EPAA and COWPTA had opposite purposes, Shell argues that the two statutes cannot be read *in pari materia.* (D.I. 342 at 67). As a result, Shell asserts that the FEA Ruling, promulgated under the EPAA, does not extend to COWPTA. (D.I. 342 at 67).

The Court finds this argument unpersuasive. Under the doctrine of *in pari materia,* statutes relating to the same subject

matter should be construed together. Black's Law Dictionary 791 (1990); *see Erlenbaugh v. United States,* 409 U.S. 239, 243–44, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). However, regardless of whether the EPAA and COWPTA address the same subject matter, Shell's reasoning disregards the direct references made in the WPT to the applicability of the June 1979 energy regulations, as well as the statements in the legislative history indicating that guidance for interpreting COWPTA should be sought in administrative regulations and rulings. The *in pari materia* doctrine need not be applied in order to perceive Congress' intent that the energy regulations be applied to COWPTA.

Along the same lines, Shell argues that even if the FEA Ruling is applicable to the Windfall Profit Tax, the tax and the Section 29 credit are not *in pari materia,* and therefore, the FEA Ruling does not extend to Section 29. The Court is not convinced by this argument. The WPT and Section 29 are parts of the same act. The legislative history of COWPTA clarifies the link between them and provides a historical context that solidifies the connection. Because the Court finds the WPT and Section 29 to be *in pari materia,* the meaning of Section 29 may be gathered from the legislative intent supporting the WPT. *Dillon, Read & Co. v. Commercial State Bank,* 62 F.2d 606, 608 (3d Cir. 1932).

Finally, Shell argues that the phrase "currently used enhanced recovery techniques," which is used in the FEA Ruling, is ambiguous and unworkable because technology is constantly changing. Again, the Court must refer to the principle that a statute's meaning is to be construed at the time of its enactment. *McDermott,* 498 U.S. at 342. Thus, the point of reference for determining what constitutes a "currently used enhanced recovery technique" would be the time at which Section 29 was enacted.

For all of these reasons, the Court finds the FEA Ruling definition of tar sands to be applicable to Section 29. With this established, the Court will now address its concerns with the industry definition proposed by Shell.

## B. Shell's Proffered Definition

Instead of the FEA Ruling definition, Shell seeks to apply an industry definition under Section 29. This definition characterizes tar sands as:

> Any consolidated or unconsolidated rock (other than coal, oil shale, or gilsonite) that either: (1) contains a hydrocarbonaceous material with a gas-free viscosity, at original reservoir temperature, greater than 10,000 centipoise, or (2) contains a hydrocarbonaceous material and is produced by mining or quarrying.

(D.I. 342 at 23–24). The definition, which Shell contends is based upon a general consensus in the petroleum industry, focuses on viscosity as the pivotal factor in categorizing oil as tar sand oil. The Court finds the Viscosity Standard to be problematic for several reasons.

### 1. Hindsight Analysis

The testimony offered at trial suggests that, in fact, there was no industry consensus regarding a definition for tar sands in 1980 when Section 29 was enacted. Shell's own expert, Dr. Aziz, conceded this point in his testimony, and Shell reiterates this concession in its Proposed Findings of Fact. (D.I. 307, Aziz at 86; D.I. 342 at 30, ¶ 102).

In addition, Dr. Aziz testified that a consensus developed in 1983, a full three years after Section 29 was enacted. (D.I. 307, Aziz at 88). In framing this consensus, Shell cites numerous agencies and organizations that approved the Viscosity Standard between 1980 and 1987. (D.I. 342 at 30, ¶ 102).

By asking the Court to apply to a 1980 statute a definition that did not come to fruition until 1983, Shell is advocating a hindsight analysis. It is axiomatic that a court must interpret a statute according to its meaning at the time it was enacted, not at some randomly-selected future time. *McDermott,* 498 U.S. at 342; *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199, *cert. denied,* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979). Thus, even if Shell had demonstrated a consensus regarding the Viscosity Standard, the fact that it arose three years after Section 29 was

enacted prevents the Court from applying the Viscosity Standard to Section 29.

To this same end, Shell provided evidence at trial of an Internal Revenue Service final draft regulation that used the Viscosity Standard to define tar sands. (PX 208, Exh. A). The parties stipulated that the draft was approved by the Director of the Legislation and Regulations Division of the IRS and circulated for final signatures. (PX 208, ¶ 3). The draft is dated November 3, 1986. (PX 208, Exh. A). Of course, the draft regulation is entitled to little, if any, weight in the Court's analysis because it never received final administrative approval and therefore was never enacted. (*See* PX 208, ¶ 4). Additionally, the draft is a 1986 document and not contemporaneous with the enactment of Section 29. In the Court's view, these two factors render the draft regulation of little value in the Court's task of interpreting the language of Section 29 at the time it was enacted in 1980.

**2. Contradictions With Congressional Intent**

Additionally, the Court finds Shell's definition to be contrary to Congress' intent in enacting Section 29. As discussed previously, both the title and the legislative history of Section 29 indicate that the credit applies to fuel from an alternative *source*. Shell's definition focuses on the *type* of fuel, rather than its source, which is incompatible with Congress' intentions. Furthermore, application of the Viscosity Standard advocated by Shell would require tar sands to be defined differently under Title I and Title II, a result which Congress clearly did not intend. An explanation of this problem requires an review of the definitions contained in COWPTA.

Title I of COWPTA imposed an excise tax (the WPT) on domestically produced "crude oil." 26 U.S.C. §§ 4986(a), 4991(a) (repealed 1988). "Crude oil" included "heavy oil" and "incremental tertiary oil." 26 U.S.C. §§ 4991(e)(1) (repealed 1988). "Heavy oil" was defined as all crude oil produced from a property with a weighted average gravity of 16 API or less. 26 U.S.C. § 4991(e)(3)(B) (repealed 1988). "Incremental tertiary oil" was defined as the excess of crude oil removed from a property during the period for which a qualified tertiary recovery project was in effect over the base level of crude oil removed from a property. 26 U.S.C. § 4993(a) (repealed 1988). A "qualified tertiary recovery project" included those methods described in Section 212.78 of the Mandatory Petroleum Price Regulations as of June 1979. 26 U.S.C. § 4993(d)(1)(A) (repealed 1988). Among these methods were "steam drive injection" [3] and "cyclic steam injection," both of which were used by Shell to recover oil in the Potter Sands.[4] 10 C.F.R. 212.78 (1979); (DX 897).

In the legislative history of Title I, Congress described crude oil as excluding "synthetic petroleum such as oil produced from ... tar sands." S.Rep. No. 96–394 at 56, 1980 U.S.C.C.A.N. at 465. Thus, Congress explicitly distinguished crude oil from tar sands, and understood tar sands to be a crude oil substitute.

Applying these definitions, oil meeting Shell's Viscosity Standard, i.e., high-viscosity oil produced by enhanced recovery methods such as steamsoak or steamflood,[5] would con-

3. Steam injection involves the cyclic application of steam, also known as steam soak, steam stimulation or steam "huff and puff." (D.I. 296 at ¶ 24). In the process, steam is injected down a well, and the well is shut-in. The steam remains in the reservoir, transferring its thermal energy to the oil and reservoir rock, reducing the oil's viscosity and allowing the oil to flow more freely toward the wellbore. (*Id.*).

4. In 1963, Shell began using steam injection technology to recover oil on the Shell Mineral Properties. (D.I. 296 at 9, ¶ 24). Steam injection technology has been used as a recovery technique in the petroleum industry for thirty to forty years. (D.I. 342 at 11); (D.I. 306, Aziz Vol. A at 72). Shell began using cyclic steam technology in 1959 in Venezuela, and also used the process in California beginning in 1960. (D.I. 313, Hite at 108); (D.I. 334, Def. FF # 52). The use of steam injection technology grew rapidly in the petroleum industry and by 1967, cyclic steam techniques were producing an estimated 120,000 barrels of oil per day. (D.I. 313, Blevins at 109).

5. In steamflood, steam is injected into the reservoir through dedicated injection wells.. (*Id.* at ¶ 58). Steamflood differs from cyclic steam methods in that steam is continuously injected into the injection well. (*Id.*). The steam enters

stitute heavy oil and incremental tertiary oil for the purposes of the WPT. Consequently, it would be taxed as crude oil and, therefore, excluded from the category of tar sands. That same oil, however, would be defined as tar sands under Section 29 according to Shell's definition. This would result in two different definitions of tar sands under Title I and Title II. Clearly, this was not the intent of Congress. *See Stockholms Enskilda Bank*, 293 U.S. at 87 (same words in different parts of same act are intended to have same meaning).

Moreover, under Shell's definition, the same oil would be subject to both a tax and a credit. Absent some evidence that Congress intended such an anomalous result, the Court cannot adopt such a position.

### C. The Tax Court Opinion

Application of the FEA Ruling definition as opposed to the Viscosity Standard definition is reinforced by the United States Tax Court's decision in *Texaco Inc. v. Commissioner of Internal Revenue,* 101 T.C. 571, 1993 WL 516193 (1993). While not binding on this Court, the identical issue is addressed and the Tax Court's reasoning is instructive.

In *Texaco,* the Tax Court was asked to define "oil produced from ... tar sands" under 26 U.S.C. § 29. *Id.* at 572. Relying exclusively on the language of the statute and an examination of its legislative history, the Tax Court concluded that Congress intended the FEA Ruling definition of tar sands to apply to Section 29. *Id.* at 576.

The Tax Court determined that Section 29 was enacted to encourage the development and production of alternative sources of crude oil. *Id.* at 575. In making this determination, the Tax Court noted that the legislative history of the WPT, Title I of COWPTA, explicitly states that crude oil, to which the WPT applied, included only natural crude petroleum and did not include synthetic petroleum such as oil produced from tar sands. *Id.* at 579 (citing S.Rep. No. 96–394, at 56 (1979), H. Conf. Rep. 96–817, at 114 (1980)). Based on its examination of the legislative history, the Tax Court concluded that Congress understood oil produced from tar sands to be a crude oil substitute and not simply a type of high viscosity crude oil. *Id.*

The Tax Court further noted that the Viscosity standard definition proposed by Texaco would require the term "tar sands" to have different meanings for purposes of Title I and Title II. *Id.* at 580. Stating that Congress would not have used the same term in fundamentally different ways within the same legislative enactment without clearly expressing an intent to do so, the court declined to adopt the plaintiff's proposed definition. *Id.* (citing *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934)). Therefore, the Tax Court held that the FEA Ruling definition of tar sands was applicable to Section 29.

Shell argues that *Texaco* is not binding precedent on this Court and that its influence is dependent upon the persuasiveness of its reasoning. (D.I. 342 at 59). Shell further argues that the Tax Court's reasoning in *Texaco* was flawed because the court misconstrued oil produced from tar sand as synthetic oil. (D.I. 255 at 33).

More specifically, Shell asserts that oil produced from tar is a form of crude oil and is not synthetic oil. (D.I. 255 at 34). In support of this position, Dr. Aziz testified that within the petroleum industry the phrase "oil produced from tar sand" means an extremely viscous crude oil produced from tar sand. (D.I. 306 at 47). Dr. Aziz testified that oil is made of hydrogen and carbon and as the fraction of carbon increases, the oil becomes more viscous. (D.I. 306 at 46). Dr. Aziz further testified that oil produced from tar sand is extremely viscous, but can be

the oil bearing area and creates a heated zone that generally forms at the top of the reservoir. This heated zone extends from the injecting well to one or more oil producing wells. The heated crude oil then flows from the heated zone to the production well, where it is pumped to the surface. (*Id.*); (D.I. 313, Blevins at 112–113).

In 1971, Shell began employing a steam drive or steamflood process on its California properties. (D.I. 334, at ¶ 57). Beginning in the early 1970's, the petroleum industry began to apply the steamflood recovery process on a large scale. (D.I. 334 at ¶ 60). By 1980, production from steamflood in California was more than 100,000 barrels of oil per day. (*Id.*).

upgraded to synthetic oil through a process whereby either hydrogen is added or carbon is removed from the oil. (D.I. 306 at 46). Consequently, only through the process of upgrading is oil produced from tar sands converted into synthetic oil. Therefore, Shell argues that the *Texaco* case should be given little or no weight by this Court because the Tax Court misconstrued oil produced from tar sands as synthetic oil. (D.I. 255 at 32–24).

The Court is not convinced. Shell advances this argument in an apparent attempt to divorce Title II from Title I and its informative legislative history and thereby render the FEA Ruling inapplicable to COWPTA. As previously discussed, defining tar sand oil as crude oil, rather than synthetic, would allow Shell to advance the theory that it is consistent to subject the same oil to the WPT and the Section 29 credit, and therefore, there is no connection between the two. However, the legislative history reveals that Congress viewed tar sand oil as a type of synthetic oil, as distinguished from crude oil. H. Rep. No. 96–394 at 56 (stating that crude oil "does not include synthetic petroleum, such as oil from ... tar sands."). Therefore, in this Court's view, the Tax Court properly characterized tar sand oil as synthetic, and applied the FEA Ruling to Section 29 appropriately.

## VII. *CONCLUSION*

For the reasons discussed, the Court concludes that the FEA Ruling definition is the proper definition to be applied in construing Section 29 of COWPTA.[6]

An Order consistent with this Memorandum Opinion will be entered.

6. As agreed by the parties, because the Court has applied the FEA Ruling definition to Section 29, the Court will not address the means by which Shell applied its Viscosity Standard.