SHELL PETROLEUM, INC., AND SUBSIDIARY CORPORATIONS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–945 T.

United States Court of Federal Claims.

Oct. 12, 2001.

Charles W. Hall, Houston, TX, counsel of record for plaintiff. Kenneth C. Gobetz, Suffern, NY, of counsel.

Dennis M. Donohue, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, for defendant, with whom were George L. Squires; Sheryl B. Flum; Mildred L. Seidman, Chief; and Paula M. Junghans, Acting Assistant Attorney General.

## OPINION

DAMICH, Judge.

Presently before the Court are the Plaintiffs' motion for partial summary judgment, filed on November 15, 1999, and the Defendant's motion for summary judgment, filed on May 18, 2000. The Court holds that hydrocarbons produced by means of enhanced recovery techniques in commercial use prior to April 2, 1980 are crude oil under Title I of the Crude Oil Windfall Profits Tax Act and cannot be oil produced from tar sands for the purpose of the section 29 tax credit for nonconventional fuels.[1] Because

---

1. Unless otherwise indicated, "section" or "§" refers to a section in the Internal Revenue Code of 1954 or 1986 (26 U.S.C.).

the Plaintiffs have failed to show that they did not use enhanced recovery techniques in commercial use prior to April 2, 1980, they cannot demonstrate that the oil that they produced was anything other than crude oil, and they cannot demonstrate that they produced from tar sands from any reservoirs at issue in this case. Therefore, the Defendant's motion for summary judgment is GRANTED and the Plaintiffs' motion for summary judgment is DENIED.

## I. Introduction

Pursuant to 26 U.S.C. § 7422 and 28 U.S.C. § 1491, the Plaintiffs seek a refund of federal income tax for taxable calendar years 1988 and 1989 under the Crude Oil Windfall Profits Tax Act ("COWPTA"), Pub.L. 96–223, 94 Stat. 229 (1980), *codified in relevant part at* 26 U.S.C. §§ 4991–4993 (repealed), for oil produced from 8 of its reservoirs which they claim to be "oil produced from tar sands," thereby qualifying for a tax credit for the production of fuel from nonconventional sources under § 29 of COWPTA.[2] Unfortunately, COWPTA does not define "tar sands." For the purposes of this case, the parties agree that the definition of a tar sand, as found in Federal Energy Agency[3] (FEA) Ruling 1976–4, 10 C.F.R. ch. II Rulings 371, 372 (1980) ("hereinafter FEA Ruling"), should control in this case. The FEA Ruling provides that a tar sand consists of:

> The several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including *currently used enhanced recovery techniques.* The hydrocarbon-bearing

rocks are variously known as bitumen-rocks, oil impregnated rocks, oil sands and rock asphalt.

*Synthetic Fuels Processed From Oil Shale and Tar Sands,* 41 Fed.Reg. 25886 (June 26, 1976) (emphasis added). This definition was adopted by another court in a previous lawsuit between the parties. *Shell Petroleum, Inc. v. United States,* 996 F.Supp. 361 (D.Del.1997), *aff'd,* 182 F.3d 212 (3rd Cir. 1999) ("*Shell I*") (involving taxable years 1982–84 and § 29(a), (c)(1)(A)). The parties disagree, however, about whether the production methods that the Plaintiffs used for the 8 reservoirs in question—steam drive injection and cyclic steam injection—are "currently used enhanced recovery techniques" in this definition. (Both parties agree that "currently used" means in use on or before April 2, 1980, the date of the enactment of COWPTA.) Obviously, if the production techniques used by the Plaintiffs at the 8 reservoirs in question are "currently used enhanced recovery techniques," then the oil produced from the reservoirs is not oil produced from tar sands, and it does not qualify for the tax credit.

## II. The Plaintiffs Are Estopped From Relitigating The Issue Of Whether Hydrocarbons Produced By Enhanced Recovery Techniques In Use Prior To April 2, 1980, Are Crude Oil And Not Oil Produced From Tar Sands For The Purposes Of The Section 29 Tax Credit.

### A. Introduction

 Defendant argues that the meaning of "currently used enhanced recovery tech-

---

2. **§ 29. Credit for producing fuel from a nonconventional source**
 (a) **Allowance of credit**—There shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to –
 (1) $3, multiplied by
 (2) the barrel-of-oil equivalent of qualified fuels –
 (A) sold by the taxpayer to an unrelated person during the taxable year, and
 (B) the production of which is attributable to the taxpayer.
 * * *
 (c) **Definition of qualified fuels.**—For purposes of this section –

 (1) **In General.**—The term "qualified fuel" means –
 (A) oil produced from shale and tar sands
 * * *
 (f) **Application of Section**—This section shall apply with respect to qualified fuels –
 (1) which are
 (A) produced from a well drilled after December 31, 1979, and before January 1, 1993
 26 U.S.C. § 29 (originally designated under § 44D.)

3. The Federal Energy Agency was a predecessor to the Department of Energy. *Shell Petroleum, Inc.,* 182 F.3d at 214 n. 3.

niques" has already been decided in *Shell I*, such that the Plaintiffs are precluded from relitigating this issue in this Court. The doctrine of issue preclusion, also known as collateral estoppel, is designed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *See also Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Issue preclusion will prevent relitigation where the record shows that: (1) the issue to be precluded in the current action is identical to one decided in an earlier action; (2) the issue was raised and actually litigated in a prior suit; (3) the issue was necessary to the judgment; and (4) the party to be estopped had a full and fair opportunity to litigate the issue in a prior suit. *In re Freeman*, 30 F.3d 1459, 1465 (Fed.Cir.1994); *Mother's Restaurant v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569–70 (Fed.Cir.1983); Restatement (Second) of Judgments § 29.

B. Whether Steam Drive Injection and Cyclic Steam Injection Techniques Are "Currently Used Enhanced Recovery Methods" Pursuant to the Definition of a Tar Sand

To understand the significance of the Defendant's somewhat complex argument in favor of applying issue preclusion, it is necessary, first, to explain the parties' substantive arguments regarding whether steam drive injection and cyclic steam injection are "currently used enhanced recovery techniques."

Essentially, Defendant argues: (1) "taxable" crude oil and oil from tar sands are mutually exclusive; (2) taxable crude oil includes oil produced by steam drive injection and cyclic steam injection techniques; and (3) therefore, the Plaintiffs did not produce

oil from tar sands from the 8 reservoirs in question because they used steam drive injection and cyclic steam injection techniques, and they cannot prove that they did not combine them with another production method that was not used in the petroleum industry before April 2, 1980. Furthermore, Defendant argues that since steam drive injection and cyclic steam injection techniques were recognized in the June 1979 energy regulations [4] as "tertiary recovery methods" or "tertiary enhanced recovery methods," they must be "currently used enhanced recovery techniques." [5]

Defendant's argument that taxable crude oil and oil from tar sands are mutually exclusive is based on the purposes of COWPTA. The purpose of Title I of COWPTA, enacted in 1980, was to impose an excise tax on revenue produced from sales of crude oil in order to recapture "windfall profits" received by domestic oil producers that would result from the Carter Administration's decision in 1979 to phase out price controls ("Mandatory Petroleum Allocation and Price Regulations") on crude oil.[6] The purpose of Title II, which contained § 29 "Credit for Producing Fuel From A Nonconventional Source," was to encourage the reduction of dependence on foreign oil by subsidizing the development of "crude oil substitutes." *Texaco, Inc. v. Commissioner*, 101 T.C. 571, 577, 1993 WL 516193 (1993). *See* S.Rep. No. 96–394 at 56, *reprinted in* 1980 U.S.C.C.N 642, 647 ("The term 'crude oil' ... applies only to natural crude petroleum and does not include synthetic petroleum such as oil from shale or tar sands."); H.R. Conf. Rep. No. 96–817, at 114 (1980), *reprinted in* U.S.C.C.A.N. 642, 667 ("The term 'crude oil' ... does not apply to synthetic petroleum such as oil production from shale or tar sands."). The Defendant argues that because "oil from tar sands" were "crude oil substitutes" not subject to

---

4. 10 C.F.R. § 212.78 (1979).

5. The parties do not dispute that "tertiary recovery methods," "tertiary enhanced recovery methods," and "enhanced recovery techniques" are the same. It is the understanding of the Court that "enhanced" or "tertiary" recovery methods are those techniques used to recover heavy crude oil by reducing the viscosity of the oil through

raising its temperature by the application of heat, steam or other substances.

6. The price controls on crude oil were enacted pursuant to section 4(a) of the Emergency Petroleum Allocation Act (EPAA), Pub.L. No. 93–159, 87 Stat. 627(173) (codified as amended at 15 U.S.C. §§ 751–760h) (expired 1981).

price controls, such are not "crude oil" for the purposes of COWPTA under both Title I and Title II since profits derived from "crude oil substitutes," such as oil produced from tar sands, were not profits that the windfall profits tax ("WPT") was designed to recapture. Thus, taxable crude oil and fuel from nonconventional sources (for example, oil produced from tar sands) are mutually exclusive. Since taxable crude oil is defined to include oil produced using steam drive injection and cyclic steam injection, such oil cannot be oil from tar sands and must instead be crude oil.[7]

Defendant notes that, according to COWPTA, if an oil recovery project used cyclic steam injection or steam drive injection techniques, the oil produced is a category of taxable crude oil known as "Tier 3 Oil." Tier 3 Oil includes "incremental tertiary oil." § 4991(a)(C). "Incremental tertiary oil" is defined (with qualifications not relevant here) as the difference between the amount of oil removed from a reservoir in a month using a "qualified tertiary project" and the average monthly oil production from that reservoir prior to the passage of COWPTA § 4993(a)-(b). A "qualified tertiary recovery project" is one that, among other requirements not relevant here, uses one or more "tertiary recovery methods." § 4993(c)(2)(A). A "tertiary recovery method" refers to "any method which is described in subparagraphs (1) through (9) of section 212.78(c) of the June 1979 energy regulations." 26 U.S.C.

§ 4993(d)(1)(A). Section 212.78(c) of the June 1979 energy regulations, relevant to the reservoirs in this proceeding, contains "steam drive injection" and "cyclic steam injection" as methods for "a project for the enhanced recovery of crude oil" or a "qualified tertiary enhanced recovery project." 10 C.F.R. 212.78(c)(2) & (6) (1980). Thus, oil produced using one of these "tertiary recovery methods" or "tertiary enhanced recovery methods" for a "qualified tertiary (enhanced) recovery project" under the June 1979 regulations, according to the Defendant, can only be "taxable crude oil" under Title I of COWPTA. Furthermore, because the tertiary enhanced recovery methods such as steam drive injection and cyclic steam injection as listed in the June 1979 energy regulations were manifestly in use before April 2, 1980, any use of such production methods that were not combined with another enhanced recovery method not available in 1980 could not possibly be a tar sand under the FEA Ruling.

The Defendant notes further that Congress's intent in COWPTA—to distinguish crude oil subject to the WPT tax from crude oil substitutes such as oil from tar sands not subject to the WPT and eligible for the section 29 tax credit for nonconventional fuels—is further confirmed by the intent of the FEA Ruling to distinguish "crude oil" that was subject to the Mandatory Petroleum Allocation and Price Regulations from "crude oil substitutes" or "synthetic products."[8] In

---

7. *Shell I*'s analysis of COWPTA described above, for which the Defendant seeks preclusive effect, mirrors the analysis in *Texaco, Inc. v. Commissioner*, 101 T.C. 571, 1993 WL 516193 (1993), the only other known case that interprets the section 29 tax credit for oil from tar sands. Texaco, like the Plaintiffs, sought a section 44D (later designated under section 29) tax credit for hydrocarbons that it claimed to be "tar sand oil." Texaco's hydrocarbons were highly viscous and "could not be economically produced through a well using only primary recovery methods." *Texaco*, 101 T.C. at 575–76. However, the Tax Court rejected Texaco's arguments and instead held that oil that could be produced using tertiary recovery methods could not be tar sand oil. *Id.* at 579–80. The Tax Court determined that, following the structure of COWPTA, Title I of COWPTA determined that any hydrocarbons produced using a tertiary production method available in 1980 were crude oil subject to the WPT. At the same time, in Title I, Congress, as re-

flected in the legislative history of COWPTA, maintained that crude oil did not include synthetic petroleum and insofar as oil production from tar sands was a crude oil substitute, oil produced from tar sands was not crude oil. *Id.* at 579. While the reference to the definition of a tar sand in defining crude oil for the purposes of Title I was not held to be necessarily determinative of the definition of a tar sand for Title II, it held that Congress would not have defined tar sands in such different ways without expressing an intent to do so. *Id.* Thus, any hydrocarbons produced by tertiary recovery methods could not considered to be tar sand oil for the purpose of section 44D.

8. The FEA Ruling stated in relevant part:

At the time of the enactment of the EPAA, domestic production of crude oil substitutes derived from oil shale, coal and tar sands was, as it is now, undertaken only for experimental

that ruling, the FEA stated that the EPAA directs the President to promulgate price controls for "crude oil," and it was an open question as to whether Congress intended that the EPAA applied to "crude oil substitutes derived from ... tar sands or other natural deposits that must be mined before the hydrocarbons can be extracted." 41 Fed. Reg. at 25886. After defining tar sands, the FEA determined that "Congress did not intend these products [oil produced from tar sands] to be regulated under the EPAA." *Id.* Therefore, oil produced from tar sands cannot be crude oil. Consequently, so the Defendant argues, any geologic formation from which oil is extracted by means of enhanced recovery techniques that were available in 1980, such as cyclic steam and stream drive injection, cannot satisfy the definition of a "tar sand" (unless combined with another enhanced recovery method not available in 1980) and any oil extracted by such enhanced recovery techniques must be crude oil.

In contrast, the Plaintiffs argue that the FEA Ruling is satisfied, thereby making any recovery of "oil produced from tar sands" subject to the section 29 tax credit if: (a) the rocks from which the oil are to be extracted contain a highly viscous hydrocarbon and (b) a portion of that hydrocarbon cannot be recovered at all or that hydrocarbon cannot be produced without changing its natural state. (Pls.' May 3, 2001, Resp. at 2.) The term "natural state," according to the Plaintiffs, refers to the "physical properties" of the extremely viscous hydrocarbons as they ex-

isted in the ground before drilling. (Pls.' Mot. for Partial Summ. J. at 17.) Theoretically then, under the Plaintiffs' interpretation of the FEA Ruling, oil recovered from a reservoir using an enhanced recovery technique which changes the physical properties of highly viscous hydrocarbons by raising the temperature of the hydrocarbons, such as steam drive injection or cyclic steam injection, but does so in conjunction with an incremental change in technology not commercially available in 1980, would satisfy the FEA definition of a tar sand and therefore be eligible for the section 29 tax credit for oil produced from tar sands.[9]

The application of issue preclusion, as the Defendant seeks, would make it extremely difficult for the Plaintiffs to prove that their oil was an oil produced from a tar sand unless they could prove that they used enhanced recovery techniques not available in 1980. However, the Plaintiffs claim that they recovered oil from extremely viscous hydrocarbons not recoverable in their natural state by means of "enhanced recovery technologies" that were not available in 1980. In conjunction with cyclic steam and steam drive injection, the Plaintiffs claim that they used the following methods characterized as "enhanced recovery technology" or "new technology." The "new technology" or "enhanced recovery technology" advanced by the Plaintiffs include: "advanced modeling tools to design, monitor, and optimize the process, sophisticated surveillance procedures to maintain the process, advanced drill-

purposes, and the synthetic products obtained thereby are not commercially available for use as refinery or petrochemical feedstocks and were not expected to become commercially available for several years. From these facts, the FEA has concluded that the Congress clearly did not intend these products to be subject to the temporary regulation required under section 4(a) of the EPAA when it enacted the EPAA to deal with the supply shortages and dislocations in the petroleum industry that occurred late in 1973 or threatened to occur before the end of February 1975.
41 Fed.Reg. at 25886.

9. In contrast, the Defendant argues that the words "natural state" in the FEA Ruling means changing the chemical composition of the hydrocarbons extracted, such as cracking a complex hydrocarbon molecule into a simple molecule.

The basis for the Defendant's interpretation of "natural state" is Treas. Reg. § 1.48–9(c)(5)(ii) (26 C.F.R.) which defines a "synthetic fuel" as a fuel that "must differ significantly in chemical composition, as opposed to physical composition, from the alternate substance used to produce it." Accordingly, an IRS General Counsel memorandum and an IRS ruling both held that, in order to become a "qualified fuel" under section 29, the fuel's production process must involve a significant chemical change. *See* G.C.M. 39548 (I.R.S.) (Nov. 30, 1984); Rev. Rul. 86–100, 1986–2 C.B. 3. There is no dispute that cyclic steam injection and steam drive recovery techniques, either in 1980 or in the form that the Plaintiffs now present before the Court, extract oil by means of pressure and application of heat and do not cause any independent change in the molecular structure of the hydrocarbon in the process.

ing and well completion techniques to control steam injection and maintain production, and advanced facilities designs to increase efficiency while lowering costs." (Def.'s Proposed Finding of Fact ("DPF") at 12.)

The "advanced modeling tools to design, monitor, and optimize the thermal process" include two major components. The first component consists of "numerical thermal simulators" which are "mathematical models (computer software) sophisticated enough to predict the behavior of a reservoir under various conditions." (Pls.' Statement of Genuine Issues ("PSGI") at 3.) The Plaintiffs allege that it was not until after 1980 when these simulators became sufficiently reliable to be useful in the field. *Id.* The second component consists of a mathematical formula known as the "Vogel model," apparently developed in the 1980s, which determined the best steam injection rate for a steam flood property. *Id.* at 4.

What the Plaintiffs describe as "sophisticated surveillance tools" is in fact a fancy term for desktop computers and the sophisticated database software that was used on the computers that developed in the 1980s, logging tools and techniques, as well as interdisciplinary team-based management of oil well projects. *Id.* at 6–7. All of these technologies, according to the Plaintiffs, were not available in 1980. The Plaintiffs' "advanced drilling and well completion projects" are terms for methods of preparing oil wells for production or injection. *Id.* at 8. These techniques were, according to the Plaintiffs, significantly improved and changed after 1980. These techniques included improved steam injector completion techniques, improved casing designs, sand control, and improved drilling techniques. *Id.* at 8–9. "Advanced facilities design" includes facilities at a reservoir that are ancillary to the oil wells themselves. These include such things as automated controls, energy cost reduction techniques, steam distribution equipment, well test equipment, production flow lines, dehydration facilities, and water treatment facilities. *Id.* at 10. The Plaintiffs claim that they made improvements to these facilities with technology that was not available in 1980. These improvements included the use

of computers, an energy efficiency study to reduce costs, a new natural gas turbine to drive an electric generator to make steam, and a device which the Plaintiffs invented and patented for distributing steam uniformly among reservoir injectors. *Id.* at 10. All of these improvements, so the Plaintiffs argue, were "enhanced recovery technology" not available in 1980.

C. The Issue of Whether Hydrocarbons Produced By Means of Enhanced Recovery Techniques In Use Prior to April 2, 1980, Are "Crude Oil" and Not "Oil Produced from Tar Sands" for the Purpose of the Section 29 Tax Credit Was Raised and Litigated in *Shell I*.

In *Shell I*, the Third Circuit, as in this case, was presented with the issue of what is the proper definition of "tar sands." In that case, the Third Circuit held that the meaning of "oil produced from tar sands" had to be divined from the statutory language and legislative history of COWPTA. After interpreting and analyzing the statutory language and legislative history of COWPTA, the Third Circuit held that the definition of "tar sands" in the FEA Ruling was "the one most compatible with congressional intent," *Shell I*, 182 F.3d at 221, because, put concisely, hydrocarbons that are produced by means of conventional oil well production methods including currently used enhanced recovery techniques in use prior to April 2, 1980, are "crude oil" and not "oil produced from tar sands" for the purpose of the section 29 tax credit. *Id.* at 223–24. This conclusion is readily apparent when the analytical steps used by the Third Circuit in interpreting the statutory language and legislative history of COWPTA are examined closely.

The Third Circuit's rationale for finding that oil extracted by means of currently used enhanced recovery techniques in use prior to 1980 are crude oil and not oil produced from tar sands mirrors the Defendant's argument that the oil produced by steam drive injection and cyclic steam injection, both enhanced (tertiary) recovery methods, from the reservoirs at issue in the present case must be crude oil and not oil produced from tar sands for the purpose of the section 29 tax credit.

First, the Third Circuit noted that in the legislative history of Title I of COWPTA, Congress explicitly distinguished "crude oil" from "oil produced from tar sands," the latter being understood as a "synthetic petroleum." *Shell I*, 182 F.3d at 222, *aff'g* 996 F.Supp. at 370 (both citing S.Rep. No. 96–394, at 56 (1979), *reprinted in* 1980 U.S.C.C.A.N. at 465). Second, the Third Circuit determined that, in enacting COWPTA, Congress intended to provide an incentive for the development of new technologies that would encourage the development and production of alternative energy sources. *Shell I*, 182 F.3d at 224, *aff'g* 996 F.Supp. at 367 (quoting from S.Rep. No. 96–394 at 6 and 87, *reprinted in* 1980 U.S.C.C.A.N. at 417 and 496). Third, the Third Circuit determined that Congress did not intend that the same hydrocarbons could be classified as both "crude oil" under Title I of COWPTA and as "oil produced from tar sands" under Title II for the purpose of the section 29 tax credit. *Shell I*, 182 F.3d at 223, *aff'g* 996 F.Supp. at 370–71. Finally, the Third Circuit determined that the FEA Ruling comports with the intent of Congress to encourage the development of new technologies by limiting the section 29 credit to crude oil substitutes that could not be obtained by conventional methods of production, including currently used enhanced recovery techniques. *Shell I*, 182 F.3d at 224, *aff'g* 996 F.Supp. at 367.

All of the above issues raised in *Shell I* are issues that are present in this case. First, as argued in *Shell I*, the Defendant maintains that the legislative history of COWPTA establishes that Congress considered "oil produced from tar sands" to be a synthetic fuel and not "crude oil." (Def.'s Reply at 5.) Second, as in *Shell I*, the Defendant here argues that the legislative history of COWPTA shows that Congress enacted the section 29 tax credit to increase alternative energy sources that involved fuels that were not being produced when Congress enacted COWPTA. (Def.'s Mot. at 8–9.) Third, the Defendant maintains, as it did in *Shell I*, that Congress intended that the same hydrocarbons classified as "crude oil" under Title I of COWPTA cannot also be classified as "oil produced from tar sands" under section 29. *Id.* Finally, the Defendant argues here, as it did in *Shell I*, that the FEA Ruling effectuates the intent of Congress to encourage the development of new technologies and to limit the section 29 credit to "crude oil substitutes" that could not be obtained using conventional oil recovery methods, including enhanced recovery techniques. (Def.'s Reply at 14.)

Therefore, so the Defendants argue, *Shell I* decided that oil produced by means of enhanced recovery techniques that were in use prior to enactment of COWPTA, April 2, 1980, must be crude oil and not oil produced from tar sands, which is identical to an issue in the present case.

However, the Plaintiffs argue that the only issue decided in *Shell I* was that the FEA Ruling was the proper definition of a tar sand as opposed to the alternative definition of tar sand oil they provided, namely, the supposed definition used in the petroleum industry that tar sand oil consisted of hydrocarbons which have a viscosity greater than 10,000 centipoise, measured at original reservoir temperature. *Shell I* at 218. However, the extent of the Third Circuit's holding is much greater than the Plaintiffs concede. It is clear as outlined above, that the Third Circuit held that the FEA Ruling was the correct definition of a "tar sand" precisely because it held that "crude oil" and "tar sand oil" under COWPTA are not the same thing. *Id.* at 223. ("The logic and structure of the act also demonstrate that crude oil is not tar sand oil."). Similarly, the Third Circuit accepted the FEA Ruling as the correct definition of a tar sand, precisely because it held that oil produced through enhanced recovery techniques could not be tar sand oil and that any other holding would be contrary to both the statutory structure of COWPTA and the congressional intent of COWPTA as found in legislative history. "Shell's proposed definition, unlike DOE's, would classify oil producible through enhanced recovery techniques as tar sand oil. Because this classification would be contrary to the statutory scheme and to congressional intent, the District Court properly adopted the definition from DOE Ruling 1976–4." *Id.* at 223–24. This holding by the Third Circuit is particularly

significant insofar as it means that if the Plaintiffs produced oil using currently used enhanced (tertiary) recovery techniques available in 1980, their oil cannot possibly be tar sand oil for the purpose of the tax credit. All of these issues were decided by the Third Circuit as essential rationales for holding that the FEA Ruling was the proper definition of tar sands.

In another bid to stave off the application of issue preclusion, the Plaintiffs argue that in *Shell I* they conceded that they were jurisdictionally precluded from arguing that their hydrocarbons would qualify as tar sand under the FEA Ruling because they failed to raise the issue in their claim for a refund. (Pls.' Opp'n at 8 n. 3.) Because it could not argue at that time that its hydrocarbons would satisfy the definition of the FEA Ruling, it should have the opportunity to do so now by arguing that its hydrocarbons meet the "literal" definition of the FEA Ruling. It is difficult, however, to see how their supposed concession is at all relevant to this case. The Plaintiffs were, according the Third Circuit, only precluded from arguing that their hydrocarbons satisfied the FEA Ruling because they could not contest that their oil in *Shell I* was anything other than "tertiary oil." *Shell I*, 182 F.3d at 223 ("Because Shell does not contest the District Court's finding that its Potter Sands oil is tertiary oil, Shell's oil cannot be tar sand oil eligible for the tax credit.") Tertiary oil cannot possibly satisfy the requirement of

FEA Ruling 1976–4 that the hydrocarbons cannot be extracted by "currently used enhanced recovery techniques." Tertiary recovery methods, which are used to produce tertiary oil, were manifestly in use before 1980. Jurisdictionally, therefore, the Plaintiffs were entitled to make arguments before the Third Circuit against the adoption of the FEA Ruling. It is from these arguments that the Court finds that the Plaintiffs raised and litigated identical issues in *Shell I* that are present in this case. For example, the Plaintiffs argued in their appellate brief that crude oil for the purposes of Title I of COWPTA could likewise be tar sand oil under Title II of COWPTA.[10] Likewise, the Plaintiffs argued on appeal that the district court's reliance on legislative history for concluding that crude oil in Title I of COWPTA should apply only to natural crude oil, but not to synthetic petroleum, was erroneous.[11] Similarly, the Plaintiffs were not precluded from arguing before the Third Circuit, as they in fact did in their appellant's brief, that denying the section 29 tax credit to oil producible with tertiary recovery methods was tantamount to the imposition of a "new technology" requirement not found in the statutory language of COWPTA. (Def.'s Reply Mot. to Strike at App. 62–63, 65.) The Third Circuit, however, rejected the Plaintiffs' argument. *Shell I*, 182 F.3d at 224. These very points were argued by the Plaintiffs before the Third Circuit for the specific purpose of opposing the district court's holding

---

**10.** *Finally,* the district court said that, if the oil at issue could be both "crude oil" for purposes of Title I and "oil produced from . . . tar sands" for purposes of Title II, "the same oil would be subject to both a tax and a credit. . . . Absent some evidence that Congress intended such an anomalous result . . . the Court cannot adopt such a position . . . ."

But this result is not at all anomalous. Def.'s Reply to Pls.' Resp. and Obj. to Def.'s Mot. to Strike Portions of Two Affs. (*hereinafter* "Def.'s Reply Mot. to Strike") at App. 68.

**11.** In its appellant brief before the Third Circuit, the Plaintiffs made the following argument:

*First,* the court relied . . . on the Senate Report's statement that the term "crude oil" in Title I should apply "only to natural crude petroleum and does not include synthetic pe-

troleum, such as oil from shale or tar sands. . . ." Consequently, according to the district court, when Congress used the words "oil produced from . . . tar sands" in Title II, it must have had in mind only synthetic petroleum. . . . Any other reading, the court believed, "would result in two different definitions of tar sands under Title I and Title II."

But Title I nowhere mentions, let alone defines, the words "tar sands." Nor does the Senate Report contain anything resembling a definition. One cannot fairly read the words "synthetic petroleum, such as oil from shale or tar sands" to indicate that *only* synthetic petroleum could qualify as oil from tar sands. An equally plausible understanding is that "oil from shale or tar sands" was merely an example of oil that could be processed into "synthetic petroleum."

Def.'s Reply Mot. to Strike at App. 66.

that the FEA Ruling was the correct definition of a tar sand.

Furthermore, the Third Circuit opinion in *Shell I* itself clearly evidences that the Plaintiffs argued in the prior proceeding that oil produced using enhanced (tertiary) recovery methods could be classified as tar sand oil as well as crude oil. *Shell I*, 182 F.3d at 221–22 ("But Shell contends that tertiary oil can be classified as both crude oil and tar sand oil, arguing that its Potter Sands oil, extracted through enhanced (tertiary) recovery methods, is also tar sand oil eligible for the Title II tax credit."). *See also* Def.'s Reply Mot. to Strike at App. 63. However, the Third Circuit rejected the Plaintiffs' argument, stating instead, "[w]e agree with the District Court that oil produced with tertiary extraction methods available in 1980, such as steam injection, does not qualify for the non-conventional source credit." *Id.* at 224.

Finally, the Plaintiffs maintain that issue preclusion is inappropriate in this tax refund case because, pointing to an exception to the doctrine of issue preclusion in tax cases, the facts in the previous case must be identical to those in the second case and the legal issue in both cases must be inseparable. *Commissioner v. Sunnen*, 333 U.S. 591, 601–02, 68 S.Ct. 715, 92 L.Ed. 898 (1948).[12] The Plaintiffs cite the following relevant part of *Sunnen:* "[b]efore a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment." *Id.* at 602, 68 S.Ct. 715. Because there are more reservoirs at issue in *Shell I* than in this case, so the Plaintiffs argue, the facts in *Shell I* cannot be identical to the present case; and therefore collateral estoppel cannot be applied.

However, the Plaintiffs fail to mention in their briefs the case of *Montana v. United States*, 440 U.S. 147, 161, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), which distinguishes *Sunnen* insofar as the *Sunnen* rule only applies to those situations where a "change in controlling legal principles had occurred between [the prior suit] and the instant suit." *Id.* *See also Bingaman v. Department of Treasury*, 127 F.3d 1431, 1437 (Fed.Cir. 1997); *Arkla, Inc. v. United States*, 37 F.3d 621, 625 n. 4 (Fed.Cir.1994); Thus, if there is not "a significant change in the legal climate," *Montana*, 440 U.S. at 161, 99 S.Ct. 970 (*quoting Sunnen*, 333 U.S. at 606, 68 S.Ct. 715) between the prior suit and the instant suit, issue preclusion is warranted.[13]

In the present case the Plaintiffs have not pointed to (nor has the Court found) any change in the controlling legal principles of the section 29 tax credit between the tax years at issue in *Shell I* and the tax years at issue in the present case. Moreover, while it is true that there are more reservoirs at issue in the present case than in *Shell I*, the outcome of the legal issue for which the Defendant seeks preclusive effect—namely, that hydrocarbons produced by enhanced recovery methods available in 1980 are crude oil for the purposes of the section 29 tax credit and cannot be oil produced from tar sands—does not depend on which reservoirs are at issue in any particular case. Oil recovered by means of pre–1980 enhanced recovery methods either qualify as oil produced from tar sands under section 29 or they do not so qualify, no matter which reservoirs are at issue and no matter which tax year is at issue.

Therefore, this Court holds that the issue of whether hydrocarbons that are produced by means of enhanced recovery techniques in use prior to April 2, 1980, are "crude oil" and

---

12. The Plaintiffs also cite *Bilzerian v. United States*, 41 Fed.Cl. 134, 138 (1998) for the same proposition, though the Court does not see how that case has any relevance to the *Sunnen* rule at all. *Bilzerian* teaches that a criminal conviction for conspiracy to defraud the IRS and the SEC for failure to appropriate forms is not an identical issue, for the purposes of issue preclusion, to the legality and, therefore, the deductibility of a payment under § 162(c)(2).

13. A change in controlling legal principles that renders the application of issue preclusion inappropriate would be when "there has been some marked advance or alteration in relevant orientation, approach, reasoning, or principles." *CBN Corp. v. United States*, 176 Ct.Cl. 861, 865, 364 F.2d 393 (1966).

not "oil produced from tar sands," for the purpose of the section 29 tax credit, was raised and litigated in *Shell I.*[14]

D. The Third Circuit's holding that hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are, for the purpose of the section 29 tax credit, "crude oil" and not "oil produced from tar sands" was necessary to the judgment.

■■■ If a matter of law or fact has been decided by a court and is necessary to its judgment, then that "decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). However, the issue in question need not be so crucial to the judgment that the judgment could not stand without it; instead, the purpose of this requirement is to prevent the adjudication of collateral issues in a prior proceeding from precluding reconsideration in a later proceeding. *Mother's Restaurant,* 723 F.2d at 1571, *Restatement (Second) of Judgments* § 27, cmt. h (1980).

The Plaintiffs argue that the Third Circuit's interpretation of the FEA Ruling is dicta because the only question before the Third Circuit was which of the two competing definitions of a tar sand applied to the section 29 tax credit, namely, whether the FEA Ruling or the industry standard was the correct definition. (Pls.' Resp. at 9.) Thus, the Third Circuit's holding that hydrocarbons produced by means of enhanced (tertiary) recovery techniques in use prior to April 2, 1980, cannot be an oil produced from a tar sand consists of only, according to the Plaintiffs, "generalized discussions about technologies not necessary to the application

of the words of FEA 1976–4." (Pls.' Resp. at 10.)

■■■ However, this Court cannot accept the Plaintiffs' sweeping view of the nature of dicta. Dicta are "[w]ords of an opinion entirely unnecessary for the decision of the case." *King v. Erickson,* 89 F.3d 1575, 1582 (Fed.Cir.1996), *rev'd on other grounds,* 522 U.S. 262, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998), *quoting Black's Law Dictionary* 1072 (6th Ed.1990). Those portions of an opinion necessary to the result are binding. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 66–67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Third Circuit came to the conclusion, affirming the district court, that the FEA Ruling was the correct definition of an oil produced from tar sands precisely because that definition was most congruous with congressional intent; namely, that Congress intended that tar sand oil was not crude oil, but instead was a crude oil substitute and that any hydrocarbons extracted with currently used enhanced oil recovery methods were, for the purposes of COWPTA, crude oil and not tar sand oil. *Shell I,* 182 F.3d at 221–22. These findings are hardly generalized discussions about technologies not essential to the holding or somehow unnecessary to the decision of the case; instead these findings are at the very heart of the reasoning of the Third Circuit's adoption of the FEA Ruling as the correct definition of "oil produced from tar sands."

Therefore, the Court finds that the Third Circuit's holding that hydrocarbons which are produced by means of currently used enhanced recovery techniques in use prior to April 2, 1980, are "crude oil" and not "oil produced from tar sands" for the purpose of the section 29 tax credit was necessary to the judgment.

14. Although *Shell I* did not explicitly interpret the words "natural state" in the definition of a tar sand in the FEA Ruling, if steam drive and cyclic steam are "currently used enhanced recovery techniques" as held by *Shell I,* then by necessary implication "natural state" cannot mean a change in the physical property of the hydrocarbons, as the Plaintiffs maintain, because these enhanced recovery techniques recover oil by changing the physical property of the hydrocarbon, i.e., raising the temperature and pressure of the rocks from which the oil is extracted. Concurrently, the Defendant's proffered definition of "natural state" as a change in chemical composition is consistent with *Shell I*'s holding that oil produced from a tar sand was contemplated by Congress, both in COWPTA and the EPAA, to be a "crude oil substitute."

E. The Third Circuit's holding that hydrocarbons which are produced by means of enhanced recovery techniques in use prior to April 2, 1980, are "crude oil" and not "oil produced from tar sands" for the purpose of the section 29 tax credit was fully and fairly litigated.

■ There can be no dispute that the Plaintiffs had a full and fair opportunity to litigate this issue in *Shell I*. The Plaintiffs were fully represented by counsel during the course of *Shell I*. *Shell I*, 182 F.3d at 213. Furthermore, the Plaintiffs did not suffer any procedural disadvantages because the Plaintiffs did in fact avail themselves of the opportunity to dispute whether hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are crude oil and not oil produced from tar sands for the purposes of the section 29 tax credit.

Consequently, the Court holds that the Plaintiffs are estopped from relitigating the issue of whether hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are crude oil and not oil produced from tar sands for the purposes of the section 29 tax credit. Thus, the Court holds that hydrocarbons produced from the reservoirs at issue using enhanced recovery techniques in use prior to April 2, 1980, are crude oil under Title I of COWPTA and not oil produced from tar sands. Having accepted the FEA Ruling as the proper definition of a tar sand; and having accepted that hydrocarbons produced by "currently used enhanced recovery methods" in use prior to 1980, including steam drive injection and cyclic steam techniques, as such do not satisfy the FEA Ruling's definition of a tar sand but instead are crude oil under Title I of COWPTA; and, finally, having accepted the reasoning of *Shell I* that hydrocarbons which satisfy the definition of "crude oil" under Title I of COWPTA cannot satisfy the FEA Ruling either, the Court now turns to the issue of whether there is an absence of evidence that the Plaintiffs produced anything other than crude oil, and whether there is an absence of evidence that Plaintiffs produced oil from tar sands. To do so, the Court must determine whether incremental changes in technology ("new technology") or "enhanced recovery technology" used by the Plaintiffs, as described in § II(B) *supra*, in conjunction with enhanced recovery methods already in commercial use prior to 1980 can be considered to be a currently used enhanced recovery technique. These issues will be discussed in more detail in the following sections.

## III. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, this burden may be discharged if the moving party demonstrates that there is an absence of evidence to support the non-moving party's case. *Id.* ("[T]he burden on the moving party may be discharged by 'showing'—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case.") If the moving party makes such a showing, the burden then shifts to the non-moving party to demonstrate that a genuine factual dispute exists. *Id.* at 322, 106 S.Ct. 2548. In order for a factual dispute to be genuine, the evidence must be such that a reasonable jury or trier of fact could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (1986). In order for the non-moving party to demonstrate that a genuine factual dispute exists, by means of an opinion, it must produce a factual foundation in sufficient detail in order for the Court to determine whether the opinion would support a verdict for the non-moving party, with all reasonable inferences drawn in favor of the non-movant. *Arthur A. Collins, Inc. v. Northern Telecom, Ltd.*, 216 F.3d 1042, 1047–48 (Fed.Cir.2000).

## IV. The Plaintiffs Do Not Have Sufficient Evidence To Show That The Hydrocarbons They Produced Are Oil From Tar Sands And Not Crude Oil.

■ The Defendant maintains that the Plaintiffs cannot prove certain essential ele-

ments of their claim that the hydrocarbons they produced from the 8 reservoirs at issue during the years 1988 and 1989 are oil from tar sands, as defined by the FEA Ruling. First, it argues that the Plaintiffs cannot show that the hydrocarbons they produced were not taxable crude oil within the definition of Title I of COWPTA.[15] This is so because the Plaintiffs used cyclic steam injection and/or stream drive injection oil-well production methods in commercial use before 1980 in 7 out of the 8 fields at issue.[16] Those production methods, according to the Defendant, are tertiary recovery methods, and oil extracted by means of such tertiary recovery methods is crude oil subject to the windfall profits tax and cannot be oil from tar sands. Second, the Defendant maintains that the Plaintiffs cannot show they used any production method other than "conventional oil well production methods including currently used enhanced recovery techniques," as stated in FEA Ruling 1976–4, to extract hydrocarbons from the reservoirs at issue. Both arguments mirror each other and therefore shall be considered together.

It is undisputed by the Plaintiffs that they used cyclic steam injection or steam drive injection methods in producing hydrocarbons from the reservoirs at issue. Following the Court's prior determination that such methods in use prior to 1980 produced crude oil and not oil from tar sands, in the absence of evidence that the cyclic steam and steam drive injection techniques used by the Plaintiffs were not in commercial use prior to 1980, the Plaintiffs cannot prove that what they produced was anything other than crude oil and not oil produced from tar sands. The Plaintiffs, however, maintain that they produced oil from the reservoirs at issue by means of enhanced recovery "technology" not available in 1980. First, they maintain that if they used "new technology" not available in 1980 in conjunction with cyclic steam and steam drive injection production methods to produce the hydrocarbons at issue, such oil would qualify for the section 29 credit as oil produced from tar sands. This argument is premised on the Third Circuit's statement in *Shell I* that "where the definition of an energy source is unclear, Congress's directive that the eligible energy sources to be subsidized 'typically involve new technologies' assists us in interpreting the provision." *Shell I*, 182 F.3d at 225. This is confirmed, in the eyes of the Plaintiffs, by the section 29(b)(5) offset provision which provides that a section 29 credit for producing oil from tar sand must be reduced by any credit allowed under section 43 with respect to the same project. *See Shell Petroleum, Inc. v. United States*, 46 Fed.Cl. 719, 723–24 (2000) (describing the section 43 tax credit for using tertiary recovery methods). According to the Plaintiffs, the existence of section 29(b)(5) would be superfluous if a steam-based project could not qualify for a section 29 credit. The Plaintiffs propose that "new technology" consists of incremental advances in technology made by combining several existing technologies in ways not previously utilized to improve domestic oil production. This proposal was advanced by Dr. James R. Schlesinger, former Secretary of Energy. *See* Schlesinger Aff. ¶¶ 23, 25. The "new technology" that they claim to have used includes advanced modeling tools, sophisticated surveillance procedures, advanced drilling and well completion techniques, and advanced facilities designs.[17] (Pls.' Statement of Genuine Issues *hereinafter* "PSGI" 3 and 10.) The Plaintiffs characterize these technologies as "enhanced recovery technologies" which are not "currently

---

**15.** The 8 reservoirs at issue are: (1) Coalinga Etchegoin; (2) Kern River Series; (3) North Midway Sunset—Potter Sands; (4) Yorba Linda Upper Conglomerate; (5) McKittrick Tulare; (6) Cat Canyon Basal—Sisquoc; (7) East Cat Canyon—Brooks; and (8) Casmalia—Monterrey. The Plaintiffs allege that during 1988 and 1989, Shell Western E & P ("SWEPI"), a Shell Petroleum affiliate, produced oil from tar sands by means of wells drilled after December 31, 1979, and before January 1, 1993, from the 8 reservoirs at issue.

**16.** The Plaintiffs have not revealed the production process at the Casmalia reservoir. Because the Plaintiffs have not made any attempt to show that they are entitled to the section 29 credit with respect to this reservoir, summary judgment is granted in favor of the Defendant with respect to the Casmalia reservoir.

**17.** These technologies are briefly described in § II(b), *supra*.

used enhanced recovery techniques" for the purposes of the FEA Ruling.[18]

The Defendant concedes that a combination of steam drive or cyclic steam injection techniques with another technology which is necessary for production of hydrocarbons from the reservoir and not in use in 1980 would qualify as oil produced from tar sands under § 29. (Def.'s Reply at 15.) However, it distinguishes such combinations from the "new technologies" proffered by the Plaintiffs insofar as none of the technologies offered by the Plaintiffs are technologies used in production. More specifically, the Defendant argues that none of what the Plaintiffs call "enhanced recovery technology" or "new technology" produce hydrocarbons. (Def.'s Reply at 18.) The Defendant argues that a production method is a technology that "move[s] hydrocarbons in a reservoir to a well bore so they can be lifted to the surface." (Def.'s Reply at 17.) This is in contrast to the Plaintiffs' proffered definition, based on the declaration of its expert, Dr. Roger Hite, that a production process consists of "all aspects of production from those work processes that begin immediately after a property has been acquired or a reservoir discovered and end when the oil is sold for shipment to a refinery." (PSGI at 12.)

There are several insurmountable difficulties with the Plaintiffs' arguments. First, the existence of the section 29(b)(5) offset provision does not result in a superfluous interpretation of the section 29 tax credit. As the Defendant points out, the offset provision could come into operation if a taxpayer purchased a cyclic steam or steam drive injection technique in conjunction with a production technique that was new or had not been combined with cyclic steam or steam drive injection before 1980 and used the combination to produce oil from tar sands. *Shell Petroleum, Inc.*, 46 Fed.Cl. at 724 n. 8. The Plaintiffs characterize their "new technology" as an "enhanced recovery *technology*" not available in 1980. This is a subtle but significant shift from the text of the FEA Ruling

which excludes hydrocarbons extracted by means of "enhanced recovery *techniques*" from the definition of a tar sand. The term "enhanced recovery technology" suggests an incremental development in pre-existing methods of production, whereas "enhanced recovery technique" connotes a method in and of itself. Accordingly, the Plaintiffs' definition of a production process is incorrect because it does not correspond with the literal text of the FEA Ruling insofar as the Plaintiffs must prove that they used an enhanced recovery *technique* not available in 1980. The Plaintiffs' proposed definition of a production process, along with their understanding of "new technology" as reflected in Dr. Schlesinger's declaration, is also too broad because it would encompass almost any ancillary task associated in some way with oil production. Almost any conceivable improvement to any ancillary technology associated in some way with pre-existing enhanced recovery methods could qualify for the section 29 tax credit. Furthermore, the Plaintiffs' definition of a "production method" is a misstatement of Dr. Hite's definition. In his declaration, Dr. Hite characterizes "a number of work processes which begin immediately after a property has been acquired (or a reservoir has been discovered) and end when the oil is sold for shipment to a refinery" as "production technology." (Pls.' Resp. at App. 0129.) Dr. Hite describes the "work process" of "production" as "to get the oil out from the reservoir to the surface." *Id.* Evidently, Dr. Hite contemplated that there are many technologies associated with production in a broad sense, but such technologies are not, strictly speaking, to be identified as the "work process" of "production." Such an understanding is consistent with the enhanced recovery techniques contained within the June 1979 energy regulations, all of which consist of production techniques in the strict sense and not with technologies associated with production in a general sense.

The Defendant's definition of a production method, therefore, is sensible and consonant

---

18. The Court rejects the Plaintiffs' argument that the Government is not entitled to summary judgment without establishing that the Plaintiffs did not use *new* technology. Under *Celotex*, it is enough for the Defendant to "point out" to the

Court that there is an absence of evidence that it used "new technology" to produce the oil at issue. *See Celotex,* 477 U.S. at 322–23, 325, 106 S.Ct. 2548.

with Dr. Hite's definition of the "work process" of "production."[19] None of the developments of technology that the Plaintiffs have pointed to as "new technology" or "enhanced recovery technology" are the work process of production. While all of the improvements demonstrated by the Plaintiffs, such as computers, software, testing equipment, generators, steam distributors, and manpower deployment are ancillary aides that make cyclic steam or steam drive injection production processes more efficient and cost-effective, these improvements do not actually move hydrocarbons or, in Dr. Hite's words, "get the oil out from the reservoir to the surface."

A further illustration of the difference between a genuine work process of production and the Plaintiffs' supposed "enhanced recovery technology" can be found in a private letter ruling of the IRS.[20] In P.L.R. 9113019, the IRS ruled that the use of cyclic steam, together with "the inclusion of ... diluent and natural gas in the injection and production phases under the particular conditions and circumstances here distinguishes this process from any conventional cyclic steam injection project." P.L.R. 9113019 (Dec. 28, 1990). In the injection phase, "hydrocarbon gas and a diluent hydrocarbon mixture are injected concurrently with steam.... The concurrent injection of gas, steam, and diluent hydrocarbons results in an injection front composed of steam, gas, diluent vapor, diluent liquid, and condensed steam. Because the entire producing zone surrounding the well is exposed to the hot fluids, these fluids penetrate the tar sand formation, and the hot gas and diluent commingle with the tar. The diluent fluidizes the tar, enabling it to flow." *Id.* Unlike the injection method described in P.L.R. 9113019, none of the supposed "new technology" or "enhanced recovery technology" not available in 1980 are injected into the well to penetrate a highly viscous hydrocarbon in order to, at least in this case, change the tar from its immobile state to a more fluid state. Instead, the function of the new technology is to assist in the more efficient use of steam-based injection methods that were commercially available in 1980.[21] Likewise, in the production phase of the technique found in the private letter ruling, "[d]iluent is injected throughout this [phase]." In contrast, the Plaintiffs' "new technology" or "enhanced recovery technology" not available in 1980 is not physically injected into the well or otherwise used to remove the highly viscous hydrocarbon from the well.

Accordingly, the Plaintiffs have failed to raise a genuine issue of material fact that they used production methods to extract "extremely viscous hydrocarbons" other than by means of cyclic steam or steam drive injections that were in commercial use prior to 1980, which, under Title I of COWPTA, would qualify as crude oil subject to the WPT and would not qualify as oil produced from tar sands under section 29.[22]

19. Likewise, in *Shell I*, the Third Circuit held that "[o]il capable of extraction through any of the enhanced production methods set forth in 10 C.F.R. § 212,78(c) is not tar sand oil." (*Shell I*, 182 F.3d at 222.) Thus, it is clear that an enhanced recovery method is a process which extracts hydrocarbons from the ground.

20. Written determinations by the IRS, unless otherwise established by regulations, cannot be used or cited as precedent. 26 U.S.C. § 6110(k)(3). The Court, therefore, expresses no opinion as to whether this process in itself would in fact qualify for the section 29 tax credit.

21. There is a seeming inconsistency between the Defendant's insistence that the term "not recoverable in its natural state" in the FEA Ruling refers to a change in the chemical composition of the highly viscous hydrocarbon and the IRS's determination in *P.L.R.* 9113019 that an enhanced recovery technique that changes the physical state of the hydrocarbon, not available in 1980, would qualify as an "oil produced from tar sands." The Court cannot determine whether the combination of steam, natural gas, and diluent would change the chemical composition of the extracted hydrocarbons in some way. Any inconsistency, however, is immaterial to the outcome of this decision because the Court has already held that, for purposes of issue preclusion, "natural state" refers to a change in the chemical composition of the highly viscous hydrocarbon, and also that the "enhanced recovery technologies" proffered by the Plaintiffs in this case would not, in and of themselves, change the physical state of the highly viscous hydrocarbon. In any event, private letter rulings are not normally binding precedent.

22. The Plaintiffs argue that somehow they are being required to satisfy a definition of a tar sand

Therefore, in the absence of any evidence that the hydrocarbons produced by the Plaintiffs at any of the reservoirs at issue are anything other than crude oil under Title I of COWPTA, and cannot be oil produced from tar sands, the Court holds that the Plaintiffs cannot show that they produced oil from tar sands for the purposes of the section 29 tax credit.[23]

## V. Conclusion

Because the Plaintiffs cannot show that they are entitled to the section 29 tax credit, the Court GRANTS the Defendant's motion for summary judgment and DENIES the Plaintiffs' motion for partial summary judgment.[24] The Clerk of the Court is directed to enter judgment, with prejudice, in favor of the Defendant and dismiss the complaint.

**IT IS SO ORDERED.**

other than the FEA Ruling, which they claim is tantamount to the revocation of a technical advice memorandum issued to them by the IRS holding that "FEA Ruling 1976–4 provides the proper definition of a tar sand for purposes of the credit under section 29 of the Code for production of fuels from nonconventional sources." *Tech. Adv. Mem.* 8940004 (June 20, 1989). Nothing in the Court's analysis, however, is contrary to the technical advice memorandum because the IRS did not address the issue of whether the Plaintiffs recovered oil by means of "currently used enhanced recovery techniques," and it explicitly held that any question of whether the Plaintiffs' production was in fact oil produced from tar sands was a factual determination under the jurisdiction of the District Director of the IRS. In applying and interpreting the FEA Ruling, this Court holds that the Plaintiffs have failed to show that they have produced hydrocarbons by means of anything other than a "currently used enhanced recovery technique." The Plaintiffs' complaint that they have been deprived of the benefit of *Technical Advice Memorandum* 8940004 or otherwise required to prove they produced oil from a tar sand on the basis of a definition of a tar sand other than the FEA Ruling is groundless.

23. The Defendant also argues that there is an absence of evidence that the Plaintiffs could not have produced hydrocarbons from any of the reservoirs at issue by means of enhanced recovery methods not in commercial use in 1980, which it claims to be an essential element to the Plaintiffs' claim. However, the Court need not resolve this issue because the Plaintiffs' claims fail on other grounds.

24. The Court grants summary judgment in favor of the Defendant with respect to the Casmalia reservoir because they have not revealed the production process for that reservoir.